**In re Ellis R. WALKER, Jr., Lorena Bolen Walker, Debtors.**

**Ellis R. WALKER, Jr., Lorena Bolen Walker, Plaintiffs,**

**v.**

**M & M DODGE, INC. and Bureau of Credit Control–Alexandria, Inc., Defendants.**

**Bankruptcy No. 90BK–80357–A7. Adv. No. 94AP–8018.**

United States Bankruptcy Court, W.D. Louisiana, Alexandria Division.

April 24, 1995.

Thomas R. Willson, Alexandria, LA, for debtors.

Harold A. Van Dyke, III, Pineville, LA, for M & M Dodge, Inc.

Edward A. Kaplan, Alexandria, LA, for Bureau of Credit Control–Alexandria, Inc.

## REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 22.01 incorporated into Local Bankruptcy Rule 1.2. No party at interest has sought to withdraw the reference to the bankruptcy court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these reasons, judgment is rendered in favor of the Plain-

tiffs. The parties will be allowed additional time to file post-trial briefs as to recovery under the Louisiana Unfair Trade Practices and Consumer Protection Act.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The complaint of the Plaintiffs, Ellis R. Walker, Jr., and Lorena Bolen Walker, allege that the defendants, M & M Dodge, Inc., and the Bureau of Credit Control—Alexandria, Inc., ("B.C.C.") violated the post-discharge injunction of 11 U.S.C. § 524 and the Louisiana Unfair Trade Practices and Consumer Protection Act set forth in La.Rev.Stat. § 51:1401, *et seq.* Further, due to such violations, the Walkers contend that the defendants owe $20,000.00 in compensatory damages, $50,000.00 in punitive damages, $25,-000.00 in attorney fees, together with interest and costs.

From 1984 to 1991, Mr. Walker was employed as a mechanic at M & M Dodge. During this time, Mr. Walker purchased two (2) automobiles from his employer. M & M Dodge extended financing to enable Mr. Walker to purchase the vehicles. On July 8, 1988, Mr. Walker acquired a 1983 Mercury Cougar for $4,057.00. Exh. P–1. Mr. Walker signed a promissory note and granted M & M Dodge a chattel mortgage on the automobile to secure payment. M & M Dodge retained money out of Mr. Walker's paycheck and applied such funds to the balance on the note and insurance on the vehicle. Thereafter, on November 12, 1988, Mr. Walker purchased a 1982 Toyota Pick-up truck for $1,369.20. Exh. P–2. Mr. Walker signed another promissory note and provided M & M Dodge with a chattel mortgage.

M & M Dodge continued to hold money out of Mr. Walker's paycheck for insurance and payments on the notes. Funds were also retained and applied to the balance on several nominal short-term loans, interest on the notes, and other charges. The separate debts were combined into one account and not designated separately. An account card was maintained by Mary L. Ducote, the bookkeeper and office manager of M & M Dodge, displaying the balance, payments,

payroll deductions, and other activity on Mr. Walker's account. Exh. P–4.

In March 1990, prior to Mr. Walker leaving M & M Dodge, the Walkers discussed the possibility of filing bankruptcy with Ms. Ducote. Ms. Ducote previously filed bankruptcy herself. She ultimately referred the Walkers to Thomas R. Willson who was her bankruptcy attorney. The Walkers also discussed the potential filing with Oliver McMickens, President and owner of M & M Dodge. Thus, M & M Dodge was unquestionably aware of the Walker's intent. In fact, Ms. Ducote and Mr. McMickens responded to a garnishment request and interrogatories by Monogram Bank against the Walkers on March 26, 1990, by stating:

> This defendant has filed a Chapter XIII Bankruptcy. His attorney is Thomas Willson, 1330 Jackson Street, Alexandria, Louisiana 71303, Telephone: 318 442–8658.

Exh. P–8.

This is significant because it demonstrates M & M Dodge's actual knowledge of the bankruptcy, the automatic stay, and the stay's powerful effect on attempted collections against the Walkers personally. Ms. Ducote testified that Monogram Bank's claim was "overridden," thus preventing the garnishment.

The Walkers retained Mr. Willson as their attorney and a petition was filed under Chapter 7 of the Bankruptcy Code on March 30, 1990, four days after the answer to the garnishment. Both Ms. Ducote and Mr. McMickens contend that the Walkers assured them that M & M Dodge would not be listed as a creditor, and would otherwise be paid outside the bankruptcy proceeding. However, M & M Dodge was listed on the mailing matrix as well as the schedules. On Schedule A–2, M & M Dodge was specified as a creditor holding security interests of approximately $3,800.00 on a 1983 Mercury Cougar and $700.00 on a Toyota Pick-up truck. On the Debtors' Statement of Intentions, the Walkers proposed to retain and reaffirm the debt on both the Cougar and the Pick-up as well as another unrelated debt to Gulfco Finance.

M & M Dodge did not file a proof of claim in the case. The meeting of creditors under § 341(a) was held on May 1, 1990. No creditors made an appearance. The Trustee, Mark Sutton, noted that the matter was a "no asset" case and that it was his intention to abandon any interest in the "Truck" and the "Mercury." M & M Dodge failed to take advantage of any of the mechanisms within the bankruptcy proceeding to obtain the collateral or other relief, such as filing a motion for relief of the automatic stay, filing a motion for abandonment, filing an adversary proceeding to determine dischargeability, or objecting to the Walker's discharge. No distributions were made to creditors

Although Mr. Walker does not remember attending the discharge and reaffirmation hearing on August 20, 1990, the records of this Court indicate that both Mr. and Mrs. Walker were present. At the hearing, the discharge was entered and a reaffirmation agreement to Gulfco Finance was approved. Orders were signed by this Court on the same date. Again, M & M Dodge received notice of the discharge. The case was later closed and a final decree was entered on October 18, 1990.

The Walkers never entered into a reaffirmation agreement with M & M Dodge. Ms. Ducote admitted that she knew what a reaffirmation agreement was, its effect, and the fact that M & M Dodge should have prepared such an agreement for the Walkers. Notwithstanding, M & M Dodge continued to retain money out of Mr. Walker's paycheck. On May 31, 1991, Mr. Walker quit his job at M & M Dodge. The Walker's later made a few sporadic payments to M & M Dodge.

Soon after, M & M Dodge sent the Walkers notice of its intent to sue for the balance on the debt. The notice also asserted that M & M Dodge planned to turn the matter over to the B.C.C. for collection. Mr. McMickens referred to this as a "form letter" and a "collection notice." Mr. McMickens also acknowledged that he made a notation on the account card stating, "[s]end suit 12–4–91 / 12/10/91." Exh. P–4. On May 6, 1992, M & M Dodge formally assigned and conveyed the Walker account of approximately $6,573.56 to the B.C.C. Exh. P–3. M & M Dodge did not

inform the B.C.C. of the Walker's bankruptcy.

For years, M & M Dodge assigned all of its delinquent accounts to the B.C.C. for collection. Mr. McMickens admitted that he intended and "hoped" that the latter file lawsuits against persons owing money to M & M Dodge. According to Mr. McMickens, these suits were filed a "majority" of the time. On May 13, 1992, the B.C.C. filed a petition against the Walkers in the Ninth Judicial District Court seeking recovery of $6,573.56 on an "Open Account" allegedly owed to M & M Dodge. Exh. P–9. Personal service was made on Mr. Walker on May 18, 1992. In the petition, no mention was made of M & M Dodge's rights under the promissory notes or the chattel mortgages. In fact, Mr. McMickens affirmatively testified that it was standard procedure not to relinquish the notes or chattel mortgages to the B.C.C.

Afterwards, Mr. Walker called Mr. Willson's office and forwarded the petition and summons to Mr. Willson's paralegal, Terri Strickland. Ms. Strickland informed Mr. Walker that she would "take care of it." The Walkers did not file an answer or a responsive pleading. Consequently, a default judgment was granted against the Walkers on July 1, 1992, in the amount of $6,573.56. The judgment was also silent as to any rights under the promissory notes or the chattel mortgages. Exh. P–3. Ms. Strickland explained that the Walkers did not file an answer because Edward Kaplan's office assured her that it was not required due to the pending bankruptcy. Mr. Kaplan is Counsel to the B.C.C.

Thereafter, a petition for garnishment was filed by the B.C.C. on August 11, 1992. The petition was served upon Southern Chevrolet, Mr. Walker's employer at the time. Mr. Walker immediately contacted Mr. Willson's office once again and spoke to Ms. Strickland. Ms. Strickland advised Mr. Walker that she would "take care of it" and called Mr. Kaplan's office. Ms. Strickland again informed Mr. Kaplan's office of the bankruptcy filing, the filing date, and the case number. However on August 21, 1992, $46.00 was withheld from Mr. Walker's paycheck.[1] Repeatedly, Mr. Walker contacted Ms. Strickland. Ms. Strickland sent Mr. Kaplan a copy of the petition and schedules listing M & M Dodge as a creditor.

After the garnishment, a representative of the B.C.C. contacted M & M Dodge to advise the former that the Walkers previously filed bankruptcy. Unquestionably, this revelation was already known by M & M Dodge. Mr. McMickens instructed the B.C.C. to "hold up" while Ms. Ducote contacted the Trustee and inquired about M & M Dodge's rights in the vehicles. Mr. Sutton supposedly told Ms. Ducote that M & M Dodge could repossess the vehicles but could not collect any money from the Walkers. *See* Exh. J–1.

On September 14, 1992, M & M Dodge hired two men from Central Auto Recovery Bureau to repossess the vehicles. Exh's P–15 and P–16. The men arrived at the Walker's home in Woodworth, Louisiana, at approximately 7:30 p.m. These men threatened to call the sheriff's department if Mr. Walker didn't sign certain documents. In fact, these documents purport to voluntarily surrender the vehicles to M & M Dodge. Exh's P–12 and P–13. As a result, Mr. Walker and his family were terribly upset due to the commotion. However, no threats of physical violence occurred. Since the vehicles were the only means of transportation for the family, Mr. Walker borrowed his father's truck until he obtained another vehicle months later. Mrs. Walker was driven to and from her place of employment by Mr. Walker and others. Ultimately, Mr. Walker obtained another vehicle.

The present matter is not the first problem M & M Dodge encountered with accounts assigned to the B.C.C. The B.C.C.'s management changed at some point when the former principal of the company, Marshall Gregory, turned over control to his son. Mr. McMickens expressed considerable dissatisfaction with the B.C.C. after such time. Mr. McMickens and Ms. Ducote also acknowledged numerous occasions whereby collection

---

1. On January 11, 1993, the B.C.C. sent a check in the amount of $38.70 to Mr. Willson's office to reimburse the Walkers.

efforts continued on accounts which in fact had been fully paid. M & M Dodge made no attempt to remedy this obvious problem.

More importantly, both Ms. Ducote and Mr. McMickens conceded that money received from the B.C.C. was earmarked as "miscellaneous income," never credited to the customer's account, and never noted on the customer's account card. Consequently, funds obtained never reduced the balance shown by M & M Dodge on its own internal records. Thus, the B.C.C. continued to collect money for M & M Dodge notwithstanding full payment or bankruptcy.

By the date of trial, the B.C.C. had ceased operations. Various accounts were, however, transferred by the B.C.C. to the Credit Bureau Collections in Houma, Louisiana.[2] The Walker's account was included in this assignment. Mr. McMickens admitted receiving a statement informing him of the assignment. M & M Dodge did not attempt to contact the Credit Bureau Collections of Houma, Louisiana, to inform it of the Walker's bankruptcy discharge.

In fact, as recently as July 18, 1994, a collection attempt was initiated against the Walkers for the debt allegedly owed M & M Dodge. Exh. P–21. This attempt was ten (10) days after this adversary proceeding was filed,[3] nineteen (19) months after M & M Dodge was sued by the Walkers in state court,[4] and twenty-one (21) months after the repossession of the vehicles. Mr. McMickens' explanation for these post-discharge, post-repossession, and post-complaint collection attempts was that the B.C.C. acted autonomously. This Court readily reopened the bankruptcy case to ensure that the essential objectives of discharge were not undermined.

2. The Credit Bureau Collection of Houma, Louisiana, is not a party to this lawsuit.

3. The Walkers filed this proceeding on July 8, 1994.

4. On December 19, 1992, the Walkers filed suit in state court against M & M Dodge and the B.C.C.

5. The Supreme Court has declared that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can

## DISCUSSION

Initially, this Court notes that the basic purpose of the bankruptcy system is to provide the debtor with a "fresh start." Remedial statutes such as the Bankruptcy Code are to be liberally construed in favor of the debtor in order to better facilitate the debtor's "fresh start." *E.g., In re Martin,* 157 B.R. 268, 272 (Bankr.W.D.Va.1993) (*citing Gleason v. Thaw,* 236 U.S. 558, 560, 35 S.Ct. 287, 288, 59 L.Ed. 717 (1915)). *See also In re Bugna,* 33 F.3d 1054, 1059 (9th Cir.1994). Discharge, however, is a privilege granted to the "honest but unfortunate debtor" and not a right accorded to all. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).[5]

In the normal bankruptcy proceeding, a discharged debtor is protected from any further collection attempts and is relieved from the emotional and legal pressure imposed by overwhelming debt. Discharge and the post-discharge injunction are integral components of the "fresh start." In this matter, the Walkers have been deprived of that opportunity as a result of M & M Dodge's persistent and prolonged violations of the post-discharge injunction. This Court is absolutely outraged and offended by M & M Dodge's seeming indifference to the bankruptcy laws and will not sit idle and allow it to interfere with Walkers' "fresh start."

### A. EFFECT OF DISCHARGE

Discharge is the legal embodiment of the "fresh start." It is the barrier that prevents creditors from reaching the wages, property, and other assets of debtors in bankruptcy. In other words, discharge establishes a legal right not to pay a debt and safeguards against harassment by the credi-

reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life and a clear field for future effort, unhampered by pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (*citing Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). *See also In re Horridge,* 127 B.R. 798, 799 (S.D.Tex.1991) (stating that discharge is not a matter of right).

tor. 11 U.S.C. § 727(b) "discharges the debtor from all debts that arose before the date of the order for relief ..." In essence, except as provided in § 523, the Code discharges the debtor from all personal liability on debts that accrued pre-petition. 11 U.S.C. § 524(a); 11 U.S.C. § 727.

The notable effect of discharge is specified in 11 U.S.C. § 524(a). Section 524(a) states in relevant part:

(1) *A discharge in a case under this title—(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor* with respect to any debt discharged under section 727, 944, 1141, 1228, 1328 of this title, whether or not discharge of such debt is waived.

(2) *operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any such debt as a personal liability of the debtor,* whether or not discharge of such debt is waived.

11 U.S.C. § 524(a)(1)–(2) (emphasis added).

██ Section 524(a) voids any judgment and enjoins the collection of a debt which effect the personal liability of the debtor. *E.g., In re Edgeworth,* 993 F.2d 51, 53 (5th Cir.1993), *reh'g denied* (June 30, 1993). Fundamentally, this section is designed to protect a debtor only from *in personam* liability.[6] Section 524(a), however, does not explicitly address the continuing validity of a discharged debt, nor does it void *ab initio* all liabilities of a debtor. The case law plainly

establishes that a secured creditor "with a loan secured by a lien on the assets of a debtor who becomes bankrupt before the loan is repaid [may] ignore the bankruptcy proceeding and look to the lien for satisfaction of the debt." *E.g., In re Simmons,* 765 F.2d 547, 556 (5th Cir.1985). Thus, any lien not invalidated or avoided survives the debtor's discharge.[7]

██ Section 524 does not prevent a creditor from enforcing a valid, pre-bankruptcy lien or security interest against property that has been retained by the estate or by the debtor after discharge. *E.g., Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). The creditor's enforcement of such a lien is considered an *in rem* action.[8] An *in rem* proceeding or action is instituted against the thing, in contradistinction to personal actions which are said to be *in personam.* BLACK'S LAW DICTIONARY 544 (Abridged 6th ed. 1991). An *in personam* proceeding is an action seeking judgment against the person involving personal rights ... as distinguished from a judgment against property. BLACK'S LAW DICTIONARY, 791, 793 (6th ed. 1990).

### B. THE POST–DISCHARGE INJUNCTION

#### 1. Voids any judgment

██ 11 U.S.C. § 524(a)(1) voids any judgment obtained relating to the personal liability of the debtor. "In essence, section 524(a) declares that any judgment rendered on a discharged debt in any forum other than the

---

6. This Court notes that the language "from the property of the debtor" was removed from § 524(a) in the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Pub.L. No. 98–353). This language was eliminated to make it clear that § 524 discharged the debtor only of his or her personal liability and did not free the debtor's property from valid security interests which attached to the property.

7. *E.g., In re Davis,* 99 B.R. 732, 733 (Bankr. W.D.La.1989); *Estate of Lellock v. Prudential Ins. Co.,* 811 F.2d 186, 189 (3d Cir.1987) (stating "that valid liens that have not been disallowed or avoided survive the bankruptcy discharge of the underlying debt."); *Chandler Bank of Lyons v. Ray,* 804 F.2d 577, 579 (10th Cir.1986); *In re Cassi,* 24 B.R. 619, 624 (Bankr.N.D.Ind.1982)

(finding that the drafters intended for unavoided liens to survive bankruptcy); *In re Nason,* 22 B.R. 690, 691 (Bankr.D.Me.1982) (it is clear from the Code that unavoided liens are intended to survive discharge); *In re Sillani,* 9 B.R. 188 (Bankr.S.D.Fla.1981) (liens pass through the bankruptcy case unaffected unless a party in interest requests the court to allow or disallow the claim).

8. *E.g., Chandler Bank of Lyons,* 804 F.2d at 579 (stating that the injunction on discharge under § 524 does not preclude *in rem* action by secured creditors); *In re Nason,* 22 B.R. at 691; *In re Cassi,* 24 B.R. at 626 (asserting Congress intended to continue the rule that valid, unavoided liens are enforceable *in rem* after discharge).

bankruptcy court null and void as it affects the personal liability of the debtor." 3 *Collier on Bankruptcy*, ¶ 524.01, p. 524–8 (15th ed. 1988). Since § 524(a)(1) refers to "any judgment at any time obtained," it is clearly applicable to judgments obtained both before and after the discharge order. Should a creditor institute a suit in state court post-discharge and obtain therein a judgment against the debtor, the judgment is void. 3 *Collier on Bankruptcy*, ¶ 524.01.

The bankruptcy court can itself find that a post-petition state court judgment void. *E.g., In re Grabinski,* 150 B.R. 427, 433 (Bankr.N.D.Ill.1993); *In re Fisher,* 113 B.R. 714, 717 (Bankr.N.D.Okla.1990); *L.F. Rothschild & Co. v. Angier,* 84 B.R. 274, 277 (D.Mass.1988). The purpose of the provision is to make it unequivocally unnecessary for the debtor to respond in the state court action.[9] In fact, the debtor does not need to advance the discharge as an affirmative defense to render the judgment void. 3 *Collier on Bankruptcy,* ¶ 524.01[2].

### 2. *Injunction against legal proceedings or other acts*

■ Moreover, § 524(a)(2) specifically states that any party is enjoined from the "commencement," "continuation," or any "act" to collect or recover the debt as a personal liability of the debtor. The injunction is intentionally broad in scope and is intended to preclude virtually all actions by a creditor to collect personally from the debtor.[10] Thus, it protects the debtor from any formal or informal attempts to collect a personal liability. As *Collier* states, "[section 524(a) ] contains an injunction prohibiting creditors holding discharged debts from: (1) commencing an action on such debt; (2) continuing such an action already initiated: 3) or employing process to collect on such debt, *e.g.,* through the use of garnishment or attachment writs." 3 *Collier on Bankruptcy,* ¶ 524.01.

■ Post-discharge lawsuits and litigation are clearly prohibited. This Court is unaware of any case in Louisiana or the Fifth Circuit similar to the present matter. However, numerous other courts have also barred further legal actions against the debtor after discharge.[11] All informal actions to collect are barred by the injunction as well. This includes telephone calls, letters, threats to collect or initiate legal action, intimidation intended to force payment, and personal contacts to collect or recover. *See supra* note 9. Even a mere threat to enforce a surviving lien will violate the injunction if the evidence

9. Under the Bankruptcy Act, the debtor often faced post-discharge actions in state court. These debtors had an affirmative duty to appear, defend the actions, and plead the discharge as an affirmative defense. 3 *Collier on Bankruptcy,* ¶ 524.01[1] *(quoting* 116 Cong.Rec. 9549 (1970)). Too often, a defense would be waived either through inadvertence or a lack of means to obtain counsel. A default would be taken and the debtor would find themselves and their property again subject to garnishment or levy. As a result of the 1970 changes, their burdens were greatly reduced and the risk much less severe. 3 *Collier on Bankruptcy,* ¶ 524.01[1]. Section 524(a) supplemented the general discharge provisions to prevent the debtor from having to appear in court or take any action whatsoever regarding such post-discharge assertions of personal liability. *Id. (quoting* H.R.Rep. 91–1502, 91st Congress, 2nd Sess.1970, and S.Rep. No. 91–1173, 91st Cong.2nd Sess.1970, U.S.Code Cong. & Admin.News 1970, p. 4156).

10. The House and Senate Reports state that "[t]he injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph has

been expanded ... to cover any act to collect, such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, threats of repossession, and the like. The change is ... intended to ensure that once a debt is discharged, the debtor will not be pressured in any way to repay it." H.R.Rep. No. 595, 95th Cong., 1st Sess. 363–64 (1978); S.Rep. No. 989, 95th Cong., 2d Sess. 80 (1978).

11. *E.g., In re Martin,* 157 B.R. 268 (Bankr. W.D.Va.1993); *In re Braun,* 141 B.R. 133 (Bankr.N.D.Ohio 1992), *amendment denied,* 141 B.R. 144, *aff'd in part, remanded in part,* 152 B.R. 466 (N.D.Ohio 1993); *In re Miller,* 81 B.R. 669 (Bankr.M.D.Fla.1988), *later proceeding, In re Miller,* 89 B.R. 942 (Bankr.M.D.Fla.1988); *In re Simonetti,* 117 B.R. 708 (Bankr.M.D.Fla.1990) (mortgage holder and its counsel found in contempt and liable for damages by seeking a deficiency judgment in state court on the discharged mortgage liability). *See also In re Funket,* 27 B.R. 640 (Bankr.M.D.Pa.1982) (post-petition recordation of a mortgage prohibited); *In re Holland,* 21 B.R. 681 (Bankr.N.D.Ind.1982) (refusal to return post-petition wages violates § 524); *In re Warren,* 7 B.R. 201 (Bankr.N.D.Ala.1980) (enforcing a garnishment order prohibited).

demonstrates that the threat is truly an effort to coerce payment. *Id.*

In this case, the Walkers were not found to have committed any acts to prevent discharge or to create exceptions to discharge under § 523 or § 727 respectively. Appropriately, they were discharged on August 20, 1990, pursuant to 11 U.S.C. § 727. A copy of the discharge order was sent to M & M Dodge by the clerk pursuant to F.R.B.P. 4004(g). The order states in part:

1. The debtor(s) is released from all personal liability for debts existing on the date of commencing of this case, or deemed to have existed on such date pursuant to Section 348(d) of the Bankruptcy Code (Title 11, United States Code).

4. All creditors are prohibited from attempting to collect, any debt that has been discharged in this case.

Exh. P–7.

M & M Dodge does not deny receiving a copy of this order. This notice should have apprised M & M Dodge that the debtors were no longer personally liable on the debt and the discharge enjoined any act to collect the debt as a personal liability.

## C. THE PETITION ON "OPEN ACCOUNT" AND JUDGMENT

At the time of the bankruptcy filing, both vehicles were still encumbered by apparently valid chattel mortgages. Therefore, M & M Dodge could have rightfully repossessed the vehicles shortly after the discharge. Instead, it attempted to have their proverbial "cake" and "eat it too." Despite receiving the notice of filing, M & M Dodge continued to retain money from Mr. Walker's paycheck and applied the funds to the balance on the debt. After Mr. Walker ended his employment with M & M Dodge, it sent a collection letter to the Walkers seeking to recover payment on the debt and declaring an intent to turnover the account to the B.C.C. Soon after, M & M Dodge assigned the account to the B.C.C. for the express purpose of collecting money.

Notwithstanding, M & M Dodge retained the notes and chattel mortgages in its control. There is no mention of these documents in its assignment to B.C.C. The B.C.C. ultimately filed a "Petition on Open Account" against the Walkers in state court seeking $6,573.56 allegedly owed to M & M Dodge. In the petition, no mention was made of M & M Dodge's rights under the promissory notes or the chattel mortgages. In fact, it was the company's standard procedure not to relinquish the notes and chattel mortgages. Consequently, the judgment rendered was also silent as to any rights under the chattel mortgages.

According to well settled Louisiana jurisprudence, where a judgment is silent with respect to any demand which is an issue in the case under the pleading, such silence constitutes an absolute rejection of that demand. *E.g., Sun Finance Co. v. Jackson,* 525 So.2d 532, 533 (La.1988) [12]. Since both the pleadings and judgment failed to mention any *in rem* remedy, it tacitly denied the existence and enforceability of the chattel mortgages. *See Sun Finance,* 525 So.2d at 533. This Court believes that M & M Dodge irrevocably forfeited all rights in the vehicles once the judgment was rendered against the Walkers personally. Thus, the notes and chattel mortgages were essentially worthless.

## D. VIOLATIONS OF THE POST–DISCHARGE INJUNCTION

It is apparent from the evidence that there have been numerous transgressions of

---

12. This Court has previously found in an unpublished opinion that a mortgage or privilege which is unrecognized in a previous judicial proceeding where recognition was sought does not survive. *In re Bennie Coleman,* Case No. 87BK–03917 (Bankr.W.D.La.1988) (*citing Sun Finance Co. v. Jackson,* 515 So.2d 540 (La.App. 1st Cir.1987); *Magee v. White,* 471 So.2d 982 (La.App. 1st Cir. 1985)). This Court stated that where "the mortgagee had not put the mortgage at issue in its suit on the note, it logically follows that it could not after the fact use the judgment on the note as a way to enforce the mortgage." *Id.* This "illustrates the importance to the creditor of carefully preserving and securing recognition of his rights at all stages of the process of collection. He is certainly not entitled nor should he expect much sympathy or liberality of construction by the courts in his efforts to execute upon his debtor's property." *Id.* (*citing* 41 La.Law Review 698 (January 1986)).

§ 524(a) by M & M Dodge. First, as stated, M & M Dodge continued to automatically retain money from Mr. Walker's paycheck notwithstanding the automatic stay under § 362 or the discharge injunction. These were in-house collections against Mr. Walker obviously employed to collect money from the debtors personally.

The Court recognizes that a debtor may always tender voluntary payments to a creditor under 11 U.S.C. § 524(f). However, numerous courts have determined that automatic withdrawal arrangements to pay pre-petition debts violated the automatic stay and the post-discharge injunction unless there was clear evidence that, post-petition, the debtor actually demonstrated his or her willingness to voluntarily have post-petition earnings applied to a dischargeable debt.[13] Specifically, these cases require that a creditor obtain some "positive indication" that a debtor intends to make voluntary payments. More importantly, the onus is placed on the creditor to ensure that no post-petition automatic payments are withdrawn, absent clear post-petition consent.

In this matter, the Court is not convinced that Mr. Walker genuinely acquiesced to the retention of these funds after filing. The record is deficient of any affirmative manifestation to voluntarily repay the debt through post-petition withdrawals, nor does M & M Dodge purport to have received the Walker's consent either orally or in writing. Moreover, M & M Dodge proffered no evidence demonstrating the procedure to commence or stop payroll deductions. The Court further finds it significant that Mr. Walker was an employee at the time of the withdrawals. Mr. Walker may have perceived some pressure to appease his employer to retain his own job.[14] Thus, there is no merit in M & M Dodge's assertion that such payments were voluntary under § 524(f). M & M undeniably violated the automatic stay of § 362 and more importantly, the post-discharge injunction of § 524(a).[15]

Second, M & M Dodge sent a collection letter to the Walkers coercing them to pay the discharged debt. Soon after, M & M Dodge assigned the account to the B.C.C. for the express purpose of collecting money. A state court petition was filed, a judgment was rendered, and garnishment was commenced. Efforts were repeatedly initiated against the Walkers two years later. As a defense to the conglomeration of collection attempts, M & M Dodge argues that the B.C.C. acted independently and under its own direction.

This Court finds little merit in their defense. Mr. McMickens admitted that he "intended" and "hoped" that a lawsuit and garnishment action would be filed to collect the debt once the account was assigned. These lawsuits were filed a "majority" of the time. The B.C.C. routinely remitted approximately one-half (½) of all money recovered to M & M Dodge, which accepted the funds without protest. M & M Dodge could have easily prevented the B.C.C. from its collection activities by a simple phone call or letter informing the latter of the Walker's discharge. Instead, M & M Dodge did nothing and

---

13. *See, e.g., O'Neal v. Beneficial of Tennessee, Inc.,* 165 B.R. 859 (Bankr.M.D.Tenn.1994). After filing, the defendant bank continued to make withdrawals from the debtors' account even after it received notice of the bankruptcy. Although the debtors failed to instruct the bank to stop the automatic payments after filing, they did not demonstrate their willingness to voluntarily have post-petition earnings applied to a dischargeable pre-petition debt. Because the bank had not shown that the debtor made any "positive indication" to make voluntary payments, the court held that the bank violated the automatic stay. *See also In re Holland,* 21 B.R. 681 (Bankr.N.D.Ind. 1982) (payroll deduction agreement violated the automatic stay and post-discharge injunction); *In re Houseworth,* 177 B.R. 557 (Bankr.N.D.Ohio 1994) (withdrawals violated the automatic stay).

14. The Court acknowledges that the sparse payments made after Mr. Walker left his job at M & M Dodge might have been voluntary under § 524(f), but that is difficult to reconcile with M & M's continued efforts to collect.

15. Neither party raised the issue of violation of the automatic stay. Nonetheless, the Court finds that M & M Dodge's post-petition, yet pre-discharge, collections from the Walkers violated § 362(a)(6). Actual damages, including costs, attorney fees, and punitive damages are allowed by willful violations of the stay under § 362(h). Once the Walkers were discharged, the stay terminated pursuant to § 362(c).

waited for the B.C.C. to uncover the fact themselves.

To further refute this defense, M & M Dodge's own internal bookkeeping and business practices would seem to facilitate such a dereliction and blatant lack of respect for the bankruptcy laws.[16] M & M Dodge's practice of designating all money received from the B.C.C. as "miscellaneous income" and never crediting same to the customer's account or noting it on the account cards is unconscionable. The prevention of such harm was exclusively within M & M Dodge's control. Admittedly, M & M Dodge was also apprised of the multiplicity of problems resulting from accounts transferred to the B.C.C. It chose, however, to pursue the Walker's, *vis a vis* the B.C.C., with "blinders" on. A person owing M & M Dodge money never escaped from its ubiquitous grasps because there always remained a balance owed on the debt.

Consequently, it is evident to this Court that M & M Dodge was certainly aware of the B.C.C.'s actions, acquiesced to the collection activities against persons who may have paid their debt, received monetary benefits from such activities, and was determined to recoup its losses irrespective of the post-discharge injunction or other legal restraints. Neither witness for M & M Dodge contradicted the assertion that it willfully violated § 362 and § 524(a) or that these infractions caused damage to the Walkers.[17] Their initial cavalier attitude of reliance on the Walkers' alleged agreement to exclude M & M Dodge from the bankruptcy proceeding quickly turned to "damn the torpedoes full speed ahead." M & M Dodge's malevolent behavior is precisely what Congress intended to prohibit by the unequivocally broad injunctive provisions of § 524(a).

Third, M & M Dodge repossessed the vehicles under no colorable right of state law as they lost all rights in the chattel mortgages. Even had the repossession been based upon valid chattel mortgages, the seizing creditor is required to show the consent of the owner to avoid liability for wrongful seizure.[18] M & M Dodge advanced that the vehicles were voluntarily surrendered. In fact, two documents purport to voluntarily surrender the vehicles. Exh's P–12 and P–13. On September 14, 1992, two men appeared on the Walker's property and threatened to call the sheriff's department if Mr. Walker didn't sign the papers. At the time, it was almost dark and Mr. Walker had to utilize a small flashlight in an attempt to read the documents. Also, Mr. Walker's family was terribly upset due to the commotion, and he hurriedly signed the papers in an effort to pacify the situation. Consequently, through the testimony and evidence adduced at trial, the Court concludes these documents were executed under duress and profess to surrender rights in collateral that were already lost.

The last all-encompassing defense proffered by M & M Dodge was that the Walkers were equitably estopped from claiming the debt was discharged because somehow it was reaffirmed. To buttress their argument, M & M Dodge contends that on

---

**16.** *See In re Roush,* 88 B.R. 163, 164 (Bankr. S.D.Ohio 1988). The creditor failed to maintain procedures or adequate safeguards to prevent its agents or employees from attempting to collect obligations previously discharged in bankruptcy. Thus, the bankruptcy court found the creditor in contempt.

**17.** Based on the testimony and his demeanor, Mr. McMickens appeared to be totally indifferent to the bankruptcy laws. The elementary distinction between *in personam* and *in rem* obligations, the general nature of the automatic stay, and the considerable protection afforded debtors by the post-discharge injunction were consciously ignored by M & M Dodge. When faced with such problems, rather than seeking the advice of legal counsel, M & M Dodge relied upon the advice of Ms. Ducote, based on her own case experience,

and Mr. Sutton, the Chapter 7 Panel Trustee. The latter's advice concerning the right to *in rem* recovery would ordinarily be correct. On these facts, such reliance was misplaced.

**18.** It is well settled that when goods are repossessed without judicial process, the consent of the owner must be demonstrated by the seizing creditor in order to avoid legal liability. *E.g., Cook v. Spillers,* 574 So.2d 464 (La.App. 2d Cir. 1991); *Moore v. Goodyear Tire & Rubber Co.,* 364 So.2d 630 (La.App. 2d Cir.1978). A default in payment does not justify the repossession by the creditor without resort to proper legal process unless the debtor voluntarily consents to the method of repossession. This consent must be proven by any fact tending to display state of mind.

the Statement of Intentions, the Walkers initially proposed to retain the vehicles and reaffirm the debt pursuant to § 521(2)(A). Moreover, the Walkers allegedly expressed a desire to exclude M & M Dodge from the bankruptcy proceeding altogether.

This is a curious argument indeed and M & M Dodge cites no case law in support. Consequently, this Court will not use its equitable power to depart from the clear confines set forth by Congress in 11 U.S.C. §§ 524(c) and (d).[19] Very often, a debtor agrees after filing to enter into agreements restating all or a proportion of the previously discharged debts. These agreements are described as "reaffirmation agreements." In essence, a reaffirmation agreement has the effect of reaffirming a debtor's pre-existing *in personam* liability on the underlying obligations giving rise to the debt. 11 U.S.C. § 524(c) sets out six (6) requirements which *must* be satisfied to create a valid reaffirmation agreement.[20]

As *Collier* states:

Subsections (c) and (d) of section 524 prohibit enforcement of the reaffirmation agreement of a discharged debt *unless the requirements of those sections have been met. Any other agreements to pay a discharge or dischargeable debt is without legal effect.*

3 *Collier on Bankruptcy,* ¶ 524.04 (emphasis added).

■ Subsections (c) and (d) delineate the exclusive procedural method to reaffirm a debt and prohibits enforcement of the agreement unless the requirements have been met. *See* 124 Cong.Rec. H–11,096 (Sept. 28, 1978); S–17,413 (Oct. 6, 1978). In fact, subsection (c) renders reaffirmation agreements effective *"only if"* the various factors are followed. The case law has uniformly adopted these exclusive prerequisites from Congress.[21] Any other procedure would effectively diminish the careful protection Congress afforded debtors against unknowing, inadvertent, or involuntary reaffirmation agreements.

The Court further notes the case of *In re Barnes,* 969 F.2d 526 (7th Cir.1992). In *Barnes,* a Chapter 7 debtor informed an unlisted creditor about the filing and orally promised to pay the creditor in full after bankruptcy. After discharge, the creditor received no money from the debtor and thus filed suit in state court. The debtor moved

---

**19.** In *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), the Supreme Court stated, in regard to the equitable powers of the Bankruptcy Court, "[t]he short answer to these arguments is that whatever equitable powers remain in the bankruptcy court must and can only be exercised within the confines of the Bankruptcy Code." Thus, this Court's equitable power may only be exercised in a manner consistent with the Code. *See also In re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1265 (5th Cir.1973); *In re Executive Office Centers, Inc.,* 96 B.R. 642, 648 (Bankr.E.D.La.1988).

**20.** These factors include: (1) the debtor must enter into a reaffirmation agreement prior to discharge and file the agreement with the court; (2) the agreement must clearly and conspicuously state that the debtor may rescind the agreement prior to discharge or within sixty (60) days after the agreement is filed with the court, whichever is later; (3) the agreement is accompanied by an affidavit of the debtor's attorney, if the debtor is represented, with a declaration that the agreement is an informed and voluntary agreement by the debtor and that the reaffirmed debt does not impose an undue hardship; (4) the debtor has not rescinded the agreement at the time of discharge or within sixty (60) days after it

is filed with the court; and (5) compliance with the procedural requirements of § 524(d). Section 524(c)(6) specifies that when the debtor is not represented by counsel, the court will grant approval only if the agreement does not impose an undue hardship on the debtor and is in the debtor's best interest. Subsection (c)(6) does not apply if the debt is a consumer debt secured by real property.

**21.** *E.g., In re Johnson,* 148 B.R. 532 (Bankr. N.D.Ill.1992); (reaffirmation agreement unenforceable for debtors' failure to attend reaffirmation hearing); *In re Fisher,* 113 B.R. 714 (Bankr. N.D.Okla.1990) (reaffirmation agreement invalid for failure to attend hearing and subsequent judgment entered therein void); *In re Perryman,* 111 B.R. 227, 230 (Bankr.E.D.Ark.1990) (lack of conspicuous language fatal to the enforceability of reaffirmation agreements); *In re Roth,* 38 B.R. 531 (Bankr.N.D.Ill.1984), *aff'd,* 43 B.R. 484 (N.D.Ill.1984) (agreement was unenforceable because the debtor did not receive the required statutory admonitions). *See also In re Johnson,* 114 B.R. 799 (Bankr.D.D.C.1990) (holding that the debtor's statement of intention to reaffirm the debt to the creditor did not constitute a reaffirmation agreement if valid reaffirmation agreement never made).

that the bankruptcy case be reopened to add the debt to the schedules, but instead the bankruptcy court issued an order declaring the debt discharged. The case was reopened three years later.

The creditor principally argued that the debtor defrauded him out of the remedy in bankruptcy, and the debtor should be estopped from claiming that the debt was discharged. The Seventh Circuit discarded this argument stating that the unlisted creditor merely had an oral promise to pay and the debtor could invoke the discharge. The court asserted that a creditor "who has notice of the bankruptcy proceeding cannot be permitted by facile invocation of fraud or estoppel to bypass the proceeding by suing to collect the original debt and thus undermine the [discharge] statute's purpose." *In re Barnes*, 969 F.2d at 530.

In this case, the Walkers never entered into a formal written reaffirmation agreement with M & M Dodge, nor were any of the other prerequisites of § 524 fulfilled. Thus, there is no merit to the equitable estoppel arguments.

### E. SCOPE OF DAMAGES FOR VIOLATION OF 11 U.S.C. § 524(a)

 Violations of the post-discharge injunction cannot be taken lightly by this Court. Otherwise, the "fresh start" will never transpire in favor of these or any other debtors. This Court determines that M & M Dodge was the exclusive actor in the matter. Their flagrant actions and relentless pursuit of these debtors are reprehensible. Having determined that M & M Dodge malevolently violated the post-discharge injunction, this Court will now address the requests for dam-

ages. The Walkers contend that the defendants owe $20,000.00 in compensatory damages, $50,000.00 in punitive damages, $25,-000.00 in attorney fees, together with interest and costs. The Court would like to carte blanche permit the entire award, but is constrained to examine whether the requests are supported by the law and evidence.

At the outset, the Court notes that, unlike 11 U.S.C. § 362(h), which authorizes an individual injured by a willful violation of the automatic stay to recover actual damages, attorney fees, and where appropriate, punitive damages, § 524 does not expressly mention such awards. Actual damages for violation of § 524 have been awarded based upon the contempt power of the court.[22] Other courts have awarded sanctions and costs to recompense the debtor, including amounts wrongfully withheld for violations of the post-discharge injunction. *E.g., In re Cost,* 161 B.R. 856 (Bankr.S.D.Fla.1993) (bankruptcy court imposed sanctions, including attorney fees, costs, and amounts wrongfully withheld from the debtor for willful violations of the post-discharge injunction). Still, some courts rely on § 105 to award actual damages. *E.g., In re Bowling,* 116 B.R. 659 (Bankr. S.D.Ind.1990) (though creditor's actions did not rise to the level of contempt to warrant an award of punitive damages, the court concluded that it was within its equity powers under § 105 to award actual damages, reasonable attorney fees, and costs to the debtor).

The majority of courts also allow punitive damages but differ as to their reasoning. Some courts expressly rely on the contempt power as authority for punitive damages.[23] The Walkers rely on the case of *In re Braun,*

---

**22.** *E.g., Behrens v. Woodhaven Ass'n,* 87 B.R. 971, 976 (Bankr.N.D.Ill.1988), *aff'd,* 1989 WL 47409, U.S.Dist. Lexis 2298 (Bankr.N.D.Ill. 1989), (the court awarded actual damages and attorney fees for the creditor's willful violation of the discharge injunction); *In re Roush,* 88 B.R. 163 (Bankr.S.D.Ohio 1988) (creditor liable for actual damages, attorney fees, and civil contempt for attempting to collect a debt previously discharged even though collection efforts were not motivated by any specific ill will or malice towards the debtors); *In re Miller,* 81 B.R. 669 (Bankr.M.D.Fla.1988), *later proceeding, In re Miller,* 89 B.R. 942 (Bankr.M.D.Fla.1988) (since the

attorney acted wilfully and with clear disrespect of the bankruptcy laws, the court stated that actual damages, attorney fees, and costs were allowed).

**23.** *E.g., In re Miller,* 81 B.R. 669, 670 (Bankr. M.D.Fla.1988), *later proceeding, In re Miller,* 89 B.R. 942, 943 (Bankr.M.D.Fla.1988) (the bankruptcy court determined that the attorney acted willfully and in clear disregard and disrespect of the bankruptcy laws and awarded punitive damages in the amount of $2,500.00).

141 B.R. 133 (Bankr.N.D.Ohio 1992), *amendment denied*, 141 B.R. 144, *aff'd. in part, remanded in part*, 152 B.R. 466 (N.D.Ohio 1993).[24] The court further notes the cases of *In re Miller*, 81 B.R. 669 (Bankr.M.D.Fla. 1988), *later proceeding, In re Miller*, 89 B.R. 942 (Bankr.M.D.Fla.1988).[25] This Court is not unmindful of the unsettled issues in the jurisprudence as to the contempt power of bankruptcy courts.[26] The power of bankruptcy courts to issue civil contempt sanctions has not been determined by the Fifth Circuit to date.[27]

■ A more compelling justification for punitive damages award such when there

**24.** In the case of *In re Braun*, a creditor and its legal counsel commenced and prosecuted a state court action to judgment to recover a discharged debt even after the debtor objected and filed a proceeding to enforce the discharge. The bankruptcy court initially awarded a reasonable amount of compensatory damages, including attorney fees. The court then asserted that it possessed the authority to impose punitive damages pursuant to § 105, its inherent contempt power, and F.R.B.P. 9011. Consequently, the court awarded punitive damages in the amount of $15,000.00 based on creditor's knowing and willful violation of the discharge order. After post-trial affidavits were filed pertaining to compensatory damages, the court awarded the debtor compensatory damages in the amount of $7,398.87. The creditor moved to amend the judgment which was denied. On appeal, the district court found that the creditor's actions in fact violated the discharge injunction. *In re Braun*, 152 B.R. at 471. Additionally, the creditor's actions warranted contempt and F.R.B.P. 9011 sanctions, but remanded the case for a proper determination of the exact amounts of such awards.

**25.** In *Miller*, an attorney acting on behalf of a lienholder persisted to contact, threaten, and request that the debtors sign a voluntary release to the mobile home in dispute. The attorney warned the debtors that if they did not comply, they would be sued and held liable for $24,-000.00, which represented the alleged unpaid balance on the original purchase contract. After the debtors informed the attorney that they filed bankruptcy and had been discharged, the attorney allegedly stated that "he does not give a damn" about the bankruptcy. The bankruptcy court first noted that it possessed the contempt power. It then determined that the attorney acted willfully and in clear disregard of the bankruptcy laws and awarded punitive damages in the amount of $2,500.00. The court refused to award actual damages because the debtor failed to introduce evidence that the medical expenses incurred were a direct result of the attorney's actions.

**26.** The authority for the bankruptcy court to exercise the contempt power has been variously found and widely debated. Many cases have asserted that the bankruptcy court's civil contempt power is inherent in their judicial responsibilities to enforce compliance with lawfully issued orders. *In re Chateaugay Corp.*, 920 F.2d 183 (2d Cir.1990); *In re Miller*, 81 B.R. 669 (Bankr.M.D.Fla.1988), *later proceeding, In re Miller*, 89 B.R. 942 (Bankr.M.D.Fla.1988). Other courts derive this power from Bankruptcy Rule 9020 or the statutory authority granted by 11 U.S.C. §§ 105(a) and (c), particularly with respect to core proceedings under 28 U.S.C. § 157(b). *In re Skinner*, 917 F.2d 444 (10th Cir.1990) (while bankruptcy courts do not have the inherent contempt power, the court concluded that Congress granted them civil contempt power by §§ 105 and 157); *In re Walters*, 868 F.2d 665 (4th Cir.1989); *Kellogg v. Chester*, 71 B.R. 36 (N.D.Tex.1987). *But see In re Sequoia Auto Brokers, Ltd.*, 827 F.2d 1281 (9th Cir.1987).

**27.** In the case of *In re Hipp, Inc.*, 895 F.2d 1503 (5th Cir.1990), the Fifth Circuit held that "bankruptcy courts do not have inherent criminal contempt powers, at least with respect to the criminal contempts committed in (or near) their presence." *Id.* at 1511. Although the holding in *Hipp* was limited to criminal contempt proceedings, the case discussed in dicta the civil contempt powers of the bankruptcy court. The Court in *Hipp* stated:

Several lower courts have determined that civil contempt proceedings, though they do not fit within any of the explicit "core" proceedings listed, they do within the section 157(b)(2)(*o*) catchall provision, which includes as being core "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims." [citations omitted]. In effect, these courts have reasoned that civil contempt is itself core because it is inseparable from the obviously core proceedings that the civil contempt power helps facilitate.

If bankruptcy civil contempt orders may arguably be core because their compliance coercive, remedial nature makes them inseparable from the underlying core proceedings, just as civil contempts generally have been viewed as part of the underlying case, then the same considerations may likewise arguably support an implicit section 157 grant to bankruptcy courts of civil contempt power. However, these considerations do not support the inference that Congress empowered bankruptcy courts to criminally punish for willful disobedience of their orders, especially where the disobedience was not in (or near) the presence of the court.

*Id.* at 1517.

was clear disregard and disrespect for the bankruptcy laws. These courts assert that to recover punitive damages for violating the post-discharge injunction, the debtor must demonstrate "malevolent intent" on the part of the violator. *E.g., In re Owen,* 169 B.R. 261 (Bankr.D.Me.1994) (*citing In re Brantley,* 116 B.R. 443, 449 (Bankr.D.Md.1990)).[28] It is not sufficient to merely show that the actions were deliberate. *Id.* The Court finds this line of cases persuasive.

 The jurisprudence is similarly split on the issue of whether debtors can recover attorney fees for a violation of the post-discharge injunction. Some courts base an award of attorney fees on the contempt power or § 105.[29] Generally, the "American Rule" governs the awarding of attorneys fees in federal courts. *E.g., In re Brantley,* 116 B.R. 443 (Bankr.D.Md.1990) (*citing F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 126, 94 S.Ct. 2157, 2163, 40 L.Ed.2d 703 (1974)). The "American Rule" provides that each party should bear the costs of his or her own litigation. This Court notes two pertinent judicially created exceptions to the "American Rule" based on the inherent equitable powers of the court: 1) when a defendant willfully disobeys a court order and 2) when a losing party acts in bad faith, vexatiously, wantonly, or for oppressive reasons. *E.g., In re Brantley,* 116 B.R. at 449 (*citing Alyeska Pipeline Co. v. Wilderness Society,*

421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). This Court believes that M & M Dodge's conduct falls within both of these exceptions. M & M willfully and maliciously disobeyed the post-discharge injunction for no other reasons than to continue to vex these debtors by its ongoing collection efforts and to oppress them.

In this case, it would be disingenuous at best to find that the actions of M & M Dodge have not caused considerable financial and emotional harm to the Walkers. In fact, the Court has never encountered such egregious behavior and lack of respect for the protection afforded debtors in bankruptcy. Moreover, this Court does not believe that Congress would enact 11 U.S.C. § 524 and not empower bankruptcy courts to dissuade invidious creditors from conduct violative of a clear congressional prohibition. To do so would be nothing more than an exercise in legislative futility.

### Actual Damages

 The Walkers are certainly entitled to actual damages for the violation of the post-discharge injunction. These reasons have already concluded that the seizure was wrongful and under no color of state law since the chattel mortgages were forfeited. Immediately afterwards, M & M Dodge sold both the vehicles for $3,822.75 in October

**28.** In the case of *In re Owen,* the debtor merely alleged "willful" violations of the injunction, thus the claim was dismissed under F.R.Civ.P. 12(b)(6). In the case of *In re Brantley,* the court held that the Chapter 7 debtor was not entitled to punitive damages from the assignee of the note for violation of the discharge injunction because she was not personally involved in collection of the note. Regarding the assignee's attorney, no punitive damages were granted because malevolent intent was not demonstrated, there was confusion over the status of knowledge of the respective parties, and the attorney was orally advised by the debtor of the discharge and not provided a copy of the discharge order.

**29.** *E.g., Kimco Leasing, Inc. v. Knee,* 144 B.R. 1001 (N.D.Ind.1992) (the discharge injunction is included in the discharge order; willful violation of a court order justifies an exception to the "American Rule" that attorneys' fees are generally not recoverable); *In re Braun,* 141 B.R. 133 (Bankr.N.D.Ohio 1992), *amendment denied,* 141 B.R. 144, *aff'd. in part, remanded in part,* 152

B.R. 466 (N.D.Ohio 1993); *In re Burson,* 107 B.R. 285 (Bankr.S.D.Cal.1989) (creditor violated § 524(a)(2) and debtor was permitted to recover reasonable attorney fees incurred in defense of that action); *In re Wasp,* 137 B.R. 71 (Bankr. M.D.Fla.1992) (state court action violated § 524(a) and court awarded debtor attorney fees and costs incurred in defending state court action and in seeking relief from bankruptcy court); *Behrens v. Woodhaven Ass'n,* 87 B.R. 971 (Bankr. N.D.Ill.1988), *aff'd,* 1989 WL 47409, 1989 U.S.Dist. Lexis 2298 (Bankr.N.D.Ill.1989) (the court awarded actual damages and attorney fees for the creditor's willful violation of the discharge injunction and contempt); *In re Miller,* 81 B.R. 669 (Bankr.M.D.Fla.1988), *later proceeding, In re Miller,* 89 B.R. 942 (Bankr.M.D.Fla.1988) (attorney ordered to pay $7,500.00 in fees and $540.85 in costs to the debtors for willful and knowing violations of the post-discharge injunction); *In re Roush,* 88 B.R. 163 (Bankr.S.D.Ohio 1988); *In re Holland,* 21 B.R. 681 (Bankr. N.D.Ind.1982) (violation of § 524 is punishable by contempt, award of attorney fees, and costs).

1992.[30] The Court believes that this amount is representative of the fair market value at the time of the illegal repossession. Although the Walkers were required to rely on relatives and borrowed transportation, they did not offer any proof of out-of-pocket expenses or loss wages in connection with their claims. Hence, the Walkers are entitled to be reimbursed only $3,822.75 for the value of their vehicles.

M & M Dodge also failed to terminate its withdrawals from Mr. Walker's paycheck after the bankruptcy filing. According to the Plaintiff's Post–Trial Memorandum, approximately $338.36 was retained from Mr. Walker's paycheck from March 30, 1990, to May 31, 1991. However, the Court is unable to reconcile this figure with Exh. P–24. Accordingly, this request is denied, as Plaintiffs have failed to carry their burden of proof on this item.

### Punitive Damages

These reasons have already discussed the justifications for punitive damages. This Court finds that the sum of $10,000.00 is an appropriate award due to M & M Dodge's malevolent behavior and clear violation of a congressional injunction.

### Attorney Fees and Costs

Since September 1992, the approximate time the vehicles were seized, Mr. Willson has performed over seventy-two (72) hours of legal work on behalf of the Walkers at a hourly rate of $150.00. Ms. Strickland, Mr. Willson's paralegal, has expended over eight (8) hours at $45.00 per hour. Thus, total attorney and paralegal fees were $9,393.50. The amount of costs and expenses were $687.20. The Court has reviewed the Mr. Willson's itemization of attorney fees and related costs incurred in this matter in view of *Johnson v. Georgia Highway Express Inc.,* 488 F.2d 714 (5th Cir.1974) and *In re First Colonial Corp.,* 544 F.2d 1291 (5th Cir. 1977), and finds that it complies with the criteria for awarding attorney fees as elaborated in those cases. Moreover, it represents reasonable fees and costs to defend against the state court lawsuit, garnishment, and to proceed with this action. Therefore, M & M Dodge is required to pay the total fees and costs of $10,080.70 to Mr. Willson.

### F. UNFAIR TRADE PRACTICES

In addition to violating the post-discharge injunction, M & M Dodge allegedly violated the Louisiana Unfair Trade Practices and Consumer Protection Act pursuant to La.Rev.Stat. § 51:1401, *et seq.* Initially, this Court agrees with the Walkers that a private right of action is afforded to an aggrieved party under La.Rev.Stat. § 51:1409. This statute states:

> Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act or practice was knowingly used, after being put on notice by the director or attorney general, the court shall award three time the actual damages sustained.

La.Rev.Stat. § 1409(A).

La.Rev.Stat. § 1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or business or commerce. . . ." Any such act is determined by the trial court on a case by case method. *E.g., Bryant v. Sears Consumer Fin. Co.,* 617 So.2d 1191, 1196 (La.App. 3rd Cir.1993) (citations omitted). A trade practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *Id.* In cases involving wrongful repossession or wrongful seizure, it has been held by Louisiana courts that such actions come under the purview of the Act. *E.g., Bryant,* 617 So.2d at 1196; *Moore v. Goodyear Tire & Rubber Co.,* 364 So.2d 630 (La. App. 2d Cir.1978); *Cook v. Spillers,* 574

---

30. M & M Dodge sold the Cougar for $1,200.00 to Durham Motors on October 17, 1992. Exh. P–16. The very next day, the Pick-up was sold to Fonda Lachney for $2,622.75. Exh. D–17.

So.2d 464 (La.App. 2d Cir.1991); *Jones v. Petty,* 577 So.2d 821 (La.App. 2d Cir.1991).

This Court finds that the actions of M & M Dodge violated the Act. Recovery under this statute may result in an award of treble damages. The action must, however, be "filed" within one year of the alleged act or transaction. La.Rev.Stat. § 51:1409(E). The record reflects that the first mention of the Act in the pleadings was more than one year after the alleged violation.

### CONCLUSION

From the forgoing reasons, this Court finds and concludes that nothing in the record justifies any recovery against the B.C.C. While the Court scarcely condones the B.C.C.'s actions and is perplexed as to why Ms. Strickland's contacts with Mr. Kaplan's office were not more fruitful, it was ultimately M & M Dodge's in-house collection efforts that caused harm to the Walkers. Undeniably, M & M Dodge has malevolently violated the post-discharge injunction of 11 U.S.C. § 524 and the Louisiana Unfair Trade Practices and Consumer Protection Act. Accordingly,

1) The judgment entered July 1, 1992, in the Ninth Judicial District Court against the Walkers for $6,573.56, together with interest and costs is void. The B.C.C. and its attorney shall take the steps necessary to vacate that judgment and release any judicial mortgages resulting from its recordation. The Walkers' remaining demands against the Bureau of Credit Control—Alexandria, Inc., are hereby denied.

2) There will be judgment herein in favor of the Walkers and against M & M Dodge, Inc., in the amount of $3,822.75, $10,000.00 in punitive damages, and $10,080.70 for attorney fees and costs.

3) The parties are allowed two (2) weeks from the date of this order to submit post-trial memoranda relating only to whether the Louisiana Unfair Trade Practices and Consumer Protection Act is prescriptive and/or peremptive of the Walkers' claim altogether, whether the claim under the Act relates back to the original pleading, and whether the Walkers are entitled to treble damages.

A separate conforming order will be entered.