**In re Robert Freeman HILL and Janet Ann Hill a.k.a. Janet Ann Pickles, Debtors.**

**Bankruptcy No. 95–13755.**

United States Bankruptcy Court, N.D. Ohio.

June 24, 1998.

Harvey S. Morrison, Cleveland, OH, for Debtors.

Joseph T. Dattilo, Legal Department, BP Exploration & Oil Company, Cleveland, OH, for BP Oil Company.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The Debtors, Robert Freeman Hill ("Hill") and his wife, Janet Ann Hill, who is known professionally as Janet Ann Pickles ("Pickles"), received their discharge in this chapter 7 case on December 8, 1995, and the case was closed on March 27, 1996. Pickles reopened

the case in March 1998 to file a motion for an order to show cause against BP Oil Company ("BP") requesting that BP be found in contempt because its postpetition attempts to collect the discharged balance of Pickles' account with BP violated section 524 of the Bankruptcy Code. This is a core proceeding under 28 U.S.C. § 157. This opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Facts

This matter was tried to the Court on May 20, 1998. There is little dispute as to BP's actions and the Debtors' reaction. The parties stipulated to most of the relevant facts. The Debtors filed their chapter 7 case on August 28, 1995. The petition listed their names as Robert Freeman Hill and Janet Ann Hill, a.k.a. Janet Ann Pickles. Schedule F to their petition specifically described two separate accounts with BP: 0502340193 with an unpaid balance of $111.12 and 0581066289 with an unpaid balance of $443.32. Both were based on Debtors' use of gasoline credit cards—the first in Hill's name and the second in Pickles' name. BP received notice of the Debtors' bankruptcy filing on September 11, 1995. Pursuant to its customary practice it searched for, and found, an account under "Hill" and blocked the Hill account from further collection. It made no search under "Pickles" and did not block the Pickles account. On September 8, after the Debtors' filing but prior to BP's receipt of notice of that filing, Arthur Rotatori, listed as an attorney for Credit Corporate Specialists, a division of BP, wrote Hill demanding payment of the $111.12 balance on his account. Upon receipt of that letter counsel for the Debtors called Mr. Rotatori and explained that the Debtors had filed for bankruptcy. He followed up with a letter to Mr. Rotatori which referenced the Hill account but not the Pickles account.

There were no collection efforts made on the Pickles account until May 30, 1996, when Pickles received a letter from CBT Credit Services, a collection agency to which BP had assigned the Pickles account, demanding payment of the $443.32 balance. Pickles testified that she turned the matter over to her husband who contacted their attorney. There is no evidence of further action in respect of that letter. BP's next, and only other, collection effort was by a letter in February 1998 from Debt Control Center, Inc., to which BP had reassigned the Pickles account, addressed to Pickles and demanding payment of $461.60. Pickles again asked Hill to respond. Hill testified that he telephoned Debt Control Center and told the person he reached that the debt had been discharged in bankruptcy. He said that he was treated rudely by that person who insisted upon seeing the entire bankruptcy file as well as notification of the discharge from the Debtors' lawyer. This treatment apparently impelled the Debtors to request their attorney to take action to forestall further collection efforts. Pickles testified that she was upset by receipt of these collection letters and that her distress in 1996 was exacerbated by ill health and resulting depression.

Patricia Larrissey testified that she had served as BP's bankruptcy administrator for about 11 years. Bankruptcy notices received by BP are directed to her. It is her responsibility to check BP's accounts against the debtors' names so that collection efforts on debtors' accounts are halted. Until this case her practice had been to search for accounts only under the joint names of a married couple and she admitted that she had ignored the Pickles name. She acknowledged that after this proceeding was filed she had changed her practice. She also testified that in her years at BP there had never been, to her knowledge, an instance where BP had been charged with violating a discharge injunction.

Pickles works with her husband as a sales representative for a medical supply company. Although there was some testimony indicating that Pickles had lost money because of being required to attend trial, the evidence was too speculative to constitute damages if liability were found. Following the trial, at the Court's request, Debtors' counsel submitted a time record indicating that he had put in 19.3 hours at the rate of $175 an hour, or $3,377.50 on the matter.

### Analysis

Section 524 of the Bankruptcy Code provides in relevant part:

A discharge in a case under this title ... operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor ....

11 U.S.C. § 524(a)(2) (1994).

■ There is no question that the 1996 and 1998 letters the collection agencies sent to Pickles violated this injunction. BP conceded at trial that the collection agency's actions were attributable to it. BP was clearly and at all times on notice that Janet Hill was also known as Janet Pickles. The fact that BP pursued in apparent good faith a procedure intended to avoid violation of the automatic stay and discharge injunction does not make the two collection letters lawful, although it may bear on whether BP's violation was "contemptuous." Debt Control Center's response to Hill's notification of the violation of Pickles' discharge also bears on that question. Instead of acknowledging the possibility of a mistake or any responsibility to check on whether its collection efforts were barred by a bankruptcy discharge, its response was oppressive and Hill reasonably concluded that the collection efforts would continue.

■ The question of what, if any, showing beyond technical violation must be made to hold a creditor in contempt for violating the § 524(a)(2) discharge injunction is unclear. There is nothing in section 524, or elsewhere in the Bankruptcy Code, which prescribes a remedy for breach of the § 524(a)(2) injunction. Despite this omission the courts that have considered the question have held that an injured debtor is entitled to recover damages in a contempt action. *Hardy v. IRS (In re Hardy)*, 97 F.3d 1384, 1389 (11th Cir. 1996); *Atkins v. Martinez (In re Atkins)*, 176 B.R. 998, 1010 (Bankr.D.Minn.1994); 4 COLLIER ON BANKRUPTCY ¶ 524.02[2][c], at 524–18 (Lawrence P. King et al., eds., 15th ed. rev.1997). Some courts have specifically

invoked section 362(h) of the Code, which provides that:

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h) (1994). *See Behrens v. Woodhaven Ass'n.*, 87 B.R. 971, 976 (Bankr. N.D.Ill.1988). Most of the courts that have considered the issue have held that the debtor must show that the creditor's violation was willful but have also held that to establish willfulness the debtor need only show that the creditor knew of the discharge injunction and that its act resulting in its violation was intentional. *See, e.g., In re Hardy*, 97 F.3d at 1390.

■ At least one court, however, has held that a contempt action under section 524(a)(2) does not require a showing of willfulness, as it would under § 362(h), but only a showing that the creditor knew of the debtor's discharge and that its action which violated the discharge was taken intentionally. *In re Atkins*, 176 B.R. at 1009–10. Since that showing would be enough to prove willfulness for most courts, *e.g., In re Hardy*, 97 F.3d at 1390, *Atkins* may not in fact support the proposition that the debtor's burden of proof is less under section 524(a)(2) than under § 362(h). In view of the apparent purpose of section 362(h) to afford debtors injured by a violation of the automatic stay a damage remedy, it would appear anomalous to provide debtors injured by a violation of the section 524(a)(2) injunction a more expansive remedy where Congress failed to specify any remedy at all. Therefore, consistent with the Eleventh Circuit's decision in *In re Hardy*, and most other cases that have addressed the issue, the Court concludes that the damage recovery under section 524(a)(2) should be constrained by the requirement in section 362(h) that the violation of the discharge injunction be "willful." Although, as noted above, the cases are nearly uniform in finding a violation willful where, as here, the creditor knew of the debtor's bankruptcy discharge and the action constituting violation of that discharge was done intentionally,

there is some question as to whether that consensus can survive the Supreme Court's recent analysis of the word "willful" in the context of section 523(a)(6) of the Code. *Kawaauhau v. Geiger*, —— U.S. ——, ——, 118 S.Ct. 974, 976–78, 140 L.Ed.2d 90 (1998).

Section 523(a)(6) denies discharge of debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (1994). There had, until *Geiger*, been a split of authority as to whether the injury itself must be intentionally inflicted under section 523(a)(6) or if it were sufficient that the act causing the injury were intentional. *See Geiger*, —— U.S. at ——, 118 S.Ct. at 976. On March 3 of this year the Supreme Court resolved the conflict with a unanimous decision that the injury, not simply the act causing the injury, must be intentional to deny discharge under section 523(a)(6). The Court pointed out that if the word "willful" were intended to refer to the act giving rise to the injury in section 523(a)(6), rather than to the injury itself, Congress "might have described instead 'willful acts that cause injury' or selected an additional word or words, i.e., 'reckless' or 'negligent,' to modify 'injury.'" *Id.* at ——, 118 S.Ct. at 975. Similarly, the word "willful" in section 362(h) appears immediately adjacent to the phrase "violation of a stay." Based upon the linguistic analysis in *Geiger*, an argument could be made that the debtor must show not only that the creditor intended the act that violated the discharge but also that the creditor must in some sense have intended the violation itself. There are, however, compelling reasons for interpreting sections 362(h) and 524(a)(2) differently than section 523(a)(6) despite the superficial similarity of their language.

The correlation between section 523(a)(6) and intentional torts drawn by the Supreme Court in *Geiger, id.* at ——, 118 S.Ct. at 977, has no analog in section 362(h) or 524(a)(2). If a court under section 362(h) or 524(a)(2) were to demand proof that the creditor intended to violate the stay or the discharge injunction, these debtor protection provisions would be rendered largely ineffective, especially when applied to creditors such as BP, which employ professional staffs to press consumers for payment of delinquent ac-

counts. If an individual debtor is to be protected from violations of the stay under section 362 or from violations of her discharge under section 524, creditors such as BP must adopt and apply appropriate procedures designed to preclude further collection efforts upon notice of a bankruptcy.

The evidence indicates that BP had instituted procedures designed to terminate collection of accounts stayed or discharged in bankruptcy, and that BP had not previously been accused of stay or discharge violations. The only flaw revealed in BP's procedures was a failure to check under an a.k.a. name where its check under the main name turned up an account. There is no evidence that this flaw in its procedures was prompted by a too aggressive or reckless collection regime. The initial question is whether such a flaw that results in a violation of the discharge injunction should be deemed willful without other evidence of bad faith.

■ There is no doubt that BP's failure to search for accounts under the Pickles name was negligent in the sense that it flowed from utilization of a defective screening procedure. The Debtors had done everything required of them to alert BP that further collection efforts against Pickles were barred including showing Pickles in the caption of their bankruptcy petition and listing her BP account by number in their schedules. BP clearly had knowledge of Pickles' filing, which, according to the cases, is enough to make BP's postdischarge collection letters willful. *See In re Hardy*, 97 F.3d at 1390; *Matthews v. United States (In re Matthews)*, 184 B.R. 594, 599 (Bankr.S.D.Ala.1995). The Court need not decide, however, whether simple negligence in devising or implementing procedures adopted in good faith to comply with section 524(a)(2) is enough to make subsequent collection efforts "willful."

The occasion for Debtors' enforcement action was not in fact the two collection letters themselves. So far as appears from the evidence, the Debtors took no action in response to the 1996 letter. The primary cause for Debtor's concern was Hill's telephone call with Debt Control Center and his apprehension that the response he received threatened that collection efforts would continue. That response was oppressive and in a real sense willful. Hill notified Debt Control Center

that the Pickles account had been discharged in bankruptcy. At that point the agency's duty was to obtain what information it reasonably needed to verify the information, not to impose burdensome and oppressive obligations under the implied threat of continued harassment. Therefore the Court finds that the 1998 letter coupled with Debt Control Center's response to Hill's phone call constituted a willful violation of the section 524(a)(2) discharge injunction. The question then becomes the measure of Pickles' damages for BP's violation.

Had Debt Control Center acknowledged to Hill that it would check out the information he provided and would send no more collection letters, there would have been no damage to Pickles beyond the annoyance of receiving a collection letter on a discharged debt. Moreover, since the most significant component of her concern was the fear that collection efforts would continue, that fear could have been allayed by a more responsible response. Pickles' rejoinder to this violation of her rights under section 524 was to invoke the Court's contempt power. BP argues that Pickles should, instead, have notified BP of the improper collection effort, as the Debtors had in 1995 by their counsel's letter to Mr. Rotatori. It argues that Pickles' actions in commencing litigation and, apparently, requesting a $500 payment were unreasonable and intended only to extort an unjustified settlement from BP.

The evidence does support the conclusion that the filing of Pickles' motion alerted BP to its mistake and would have precluded further collection efforts against Pickles without further litigation. BP suggests that Pickles should at most be entitled to attorneys fees for the brief time required by counsel to make that notice effective. But whether any payment would have been forthcoming from BP is at best speculative. At trial BP vigorously disputed its liability for any attorneys fees incurred by Pickles on account of its breach of the section 524 injunction.

Several courts that have considered this issue have recognized that relatively minor violations such as this will inevitably occur and should, ideally, be resolved without litigation, *see Price v. Pediatric Academic Ass'n*, 175 B.R. 219, 221–22 (S.D.Ohio 1994); *In re Roush*, 88 B.R. 163, 165 (Bankr. S.D.Ohio 1988), but that in an adversary system the party wronged should generally be allowed access to the justice system where necessary to vindicate her rights. *See In re Price*, 179 B.R. 70, 72 (Bankr.S.D.Ohio 1995). Where, as here, however, the violation was relatively minor and the plaintiff's sole damages are her attorneys fees, the Court can and should review those fees carefully to avoid the reality or appearance that the Court is rewarding an excessively litigious approach to such violations.

In general, both the rate and time expended by Pickles' counsel appear reasonable. Consistent with the above admonition, however, the Court has cut four hours of time devoted by Pickles to pretrial motions, which the Court views as unreasonable under the circumstances.

The Court's order in conformity with this opinion is attached.

### ORDER

For the reasons stated in the Memorandum of Opinion entered on the date hereof, it is ordered that BP Oil Company pay to Janet Ann Pickles $2,677.50 to reimburse her for attorney's fees in this matter.