**In re Dennis & Mary LAFFERTY, Sr., Debtors.**

**In re Joseph & Terry Dillemuth, Debtors.**

**Bankruptcy Nos. 88–50620, 89–50124.**

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

July 27, 1998.

Carl Hiteman, Medina, OH, for debtors.

Anthony DeGirolamo, Roetzel & Andress, Akron, OH, for National Check Bureau.

Richard Baumgart, Dittilbach Sicherman & Baumgart, Cleveland, OH, for Ohio Savings Bank.

## OPINION FINDING OHIO SAVINGS AND NATIONAL CHECK BUREAU IN CONTEMPT FOR VIOLATION OF THE DISCHARGE INJUNCTION

MARILYN SHEA-STONUM, Bankruptcy Judge.

The Court held a hearing in the above captioned cases on the debtors' motions to find Ohio Savings Bank ("Ohio Savings") and National Check Bureau ("National") in contempt for violation of the discharge injunction under 11 U.S.C. § 524. This is a core proceeding under 28 U.S.C. § 157(b)(2)(O). The Court has jurisdiction to enter a final order in this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference entered in this District on July 16, 1984.

Appearing at the hearing were Carl Hiteman, counsel for all debtors; Anthony DeGirolamo, counsel for National; and Richard Baumgart, counsel for Ohio Savings. In reaching its decision, the Court considered the admitted exhibits and the testimony of the following persons: Mary Lafferty, debtor; Joseph Dillemuth, debtor; John Bader, president of National; Cliff Cortright, collections manager for Ohio Savings; and Arthur Neuman, Ohio Savings' senior vice president of operations.

### Factual History

The following chronologies of events relevant to the debtors' motions are not disputed. On April 13, 1988, Dennis and Mary Lafferty (the "Laffertys") filed a joint petition under chapter 7 of the Bankruptcy Code, case number 88–50620. They listed an unsecured, non-priority debt to Ohio Savings in the amount of $3,112.00. Ohio Savings filed a proof of claim in the amount of $3,136.24. Ohio Savings filed neither a complaint objecting to discharge of debtor under § 727 nor a complaint to determine dischargeability of debt under § 523. On October 13, 1988, the Laffertys received a discharge of their scheduled debt under 11 U.S.C. § 727. On October 20, 1988, a notice of that discharge was sent to Ohio Savings by the Clerk of Court at the following addresses: Ohio Savings Plaza, Cleveland, Ohio 44113–3103 and P.O. Box 8002, Wickcliffe, Ohio 44092–8002. On November 23, 1988, the chapter 7 case was closed. On August 4, 1997, National filed a complaint against Mary Lafferty in Medina Municipal Court to collect on the Ohio Savings debt. Ms. Lafferty through her counsel filed an answer stating that the debt had been discharged in bankruptcy. Ms. Lafferty's attorney appeared at a pre-trial on the complaint. A representative from National did not appear. On September 30, 1997, the Medina Municipal Court entered a judgment entry dismissing the case with prejudice.

Joseph and Terry Dillemuth (the "Dillemuths") filed a joint petition under chapter 7 of the Bankruptcy Code, case number 89–50124, on January 24, 1989. They listed an unsecured, non-priority debt to Ohio Savings in the amount of $2,000.00. Ohio Savings filed a proof of claim in the amount of $2,077.08 and did not file a complaint objecting to discharge of debtor under § 727 or a complaint to determine dischargeability of debt under § 523. On June 28, 1989, the Dillemuths received a discharge of their scheduled debt under 11 U.S.C. § 727, including the debt owed to Ohio Savings. On July 7, 1989, a notice of that discharge was sent to Ohio Savings by the Clerk of Court at the following address: Ohio Savings Plaza, Cleveland, Ohio 44113–3103. On July 27, 1989, the chapter 7 case was closed. In August of 1997, National filed a compliant against the Dillemuths in Barberton Municipal Court to collect on the Ohio Savings' debt. The Dillemuths, through their counsel, filed an answer stating that the debt had been discharged in bankruptcy and demanding that the complaint be dismissed. On January 7, 1998, an entry of dismissal sub-

mitted by National was entered with prejudice by the Barberton Municipal Court.

On August 28, 1997, Carl Hiteman, attorney to both the Dillemuths and the Laffertys, filed a motion to reopen the cases in order to file motions for contempt against Ohio Savings and National for violation of the discharge injunction. Both Ohio Savings and National were served with copies of the motions, neither National nor Ohio Savings responded, and on October 7, 1997, the Court reopened the cases. On February 26 and 27, 1998, the Dillemuths and Laffertys through their attorney moved for a finding that Ohio Savings and National had violated the post-discharge injunction in 11 U.S.C. § 524(a)(2). National filed a response in opposition in the Dillemuth case.

On April 1, 1998, the Court held a joint preliminary hearing on these matters at which Carl Hiteman, counsel for debtors in both cases, and Tony DeGirolamo, counsel for National, appeared. No one entered an appearance on behalf of Ohio Savings. Mr. DeGirolamo informed the Court that in 1997 Ohio Savings sold a portfolio of debt to National which included the discharged debts of the Laffertys and Dillemuths and that National then filed lawsuits against the debtors to collect on those discharged debts in various municipal courts.

The Court set a final hearing for May 19, 1998 at which Ohio Savings was ordered to appear. Prior to that hearing, Ohio Savings filed a response to the debtors' motions for contempt. Mr. Hiteman filed subsequent proposed stipulations to which both counsel for National and Ohio Savings concurred at the hearing. Specifically, Ohio Savings agreed that it had received notice of both the filing of bankruptcy and the discharge of debt of the Laffertys and Dillemuths. National agreed that it had filed lawsuits in 1997, that answers were filed raising the defense of bankruptcy, and that the complaints were eventually dismissed either by National or the court. Based upon the record created at the final hearing on May 19, 1998, the Court makes the following findings.

Ohio Savings entered into an agreement with Unifund CCR Partners (Unifund) for the purchase by Unifund of Ohio Savings accounts receivable dated May 19, 1997 (the "Agreement"). *See* Ex. National–1. The average price paid for these accounts was less than three cents per face value dollar amount. According to testimony of John Bader, National's president, on that same day Unifund executed a document transferring ownership of the accounts receivable covered in the Agreement to National for no consideration. National is owned in part by Unifund. At one point, Bader testified that National was an affiliate of Unifund. He later clarified that Unifund and Bader jointly own equal shares of National stock. Representatives of Ohio Savings claim that they did not know of the existence of National until after the Agreement was executed. National appears to have been acting both for its own benefit and as an agent of Unifund in the actions under scrutiny. However, Unifund was not made a party to this motion.

The Agreement provides for Ohio Savings to sell accounts receivable that Ohio Savings determined to be "Qualified Receivables." Under the Agreement, Qualified Receivables are defined as:

"any Receivable ... owing to Seller (immediately prior to the effectiveness of the transfer contemplated hereby) which at the date of delivery of the Bill of Sale, complies with the following: ...

(b) the Receivable is a bona fide obligation under a Contract which is legally valid, binding and enforceable, *except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally ...;*

(e) the Account Debtor *is not* a debtor in a case under the Bankruptcy Code, unless such Account Debtor has the authorization of a bankruptcy court of competent jurisdiction to make payments under the related Contract and such payments are not the subject of any legal challenge." [1]

1. While interpretation of this Agreement will occur in the pending state court action, the Court would note what it views as ambiguous contractual language in the Agreement. Subsection (e)

*See* Ex. National–1 (emph. added). The Agreement also provides that upon the discovery of any non-conforming receivables, Ohio Savings will either repurchase those accounts or substitute other Qualified Receivables. Finally, the Agreement contains a warranty/representation of Ohio Savings that each account receivable transferred to Unifund is a Qualified Receivable. Both Ohio Savings' collection manager and senior vice-president of operations testified that they knew Unifund would be collecting on the accounts receivable that Ohio Savings was selling.

Before the sale of such accounts receivable, Ohio Savings engaged in certain file sorting to determine which accounts receivable were Qualified Receivables under the Agreement. Ohio Savings' collection manager testified that he reviewed the accounts receivables in order to eliminate any ineligible accounts. Accounts were eliminated based on numerical coding in Ohio Savings' computer system identifying uncollectible accounts. During the period between 1987 and the present, Ohio Savings coded accounts under two successive systems. Between 1987–1992 when the Dillemuth and Lafferty accounts would have been encoded, Ohio Savings coded accounts with one generic number to represent uncollectible accounts and did not delineate the reason the account was uncollectible. Thus, the same generic number would be used regardless of whether the account was uncollectible because, for example, the debtor was deceased or had filed for bankruptcy. By the time Ohio Savings sold accounts to Unifund/National, a new system was in place that used a specific code for bankruptcy. Some accounts sold to Unifund were coded under the old system and some accounts were coded under the new system. The use of the old generic code resulted in the inclusion in the portfolio of debt pur-

chased by Unifund/National of some accounts receivable as to which the account debtor's personal liability had been discharged in bankruptcy proceedings. At the time that portfolio was assembled, Ohio Savings' collections manager was not aware of the deficiency in reliance on the codes for the pre–1993 period until approximately September–October of 1997, after the Agreement with Unifund was executed.

In June of 1997, Ohio Savings received calls from former account debtors notifying Ohio Savings that they had received collection letters from National. Ohio Savings then contacted Unifund about these account debtors and bought back approximately 45–50 ineligible accounts. Ohio Savings also spent time talking with those customers and sending out over 100 apology letters. In July, 1997, National sent a letter to Ohio Savings about repurchasing approximately 800 possibly ineligible accounts; however, no such repurchase occurred. Sometime in either September or October, 1997, after Ohio Savings became aware of the problems with its coding system, Ohio Savings notified Unifund/National that it should cease collections on those accounts.

There was dispute among the two parties about certain representations made during the negotiation of the Agreement. Ohio Savings claims it told Unifund that there was a possibility that some ineligible accounts would be included and that it relied on the representation of Unifund that the accounts would be checked again by Unifund before any collection activity began. Ohio Savings also claims that Unifund/National stated that it would review the accounts for eligibility of collection prior to taking any action. National alleges that Ohio Savings represented that the accounts receivable would be free of any accounts affected by bankruptcy. Both any physical files and any microfiche files were

could be interpreted to mean that the Account Debtor is not *at present time* a debtor in bankruptcy. Also, under subsection (b), if National found it imperative that a Qualified Receivable excluded those accounts previously discharged in bankruptcy, perhaps it should have used obvious wording to require that such accounts were not "discharged in bankruptcy." The 26 page Agreement is otherwise silent on the issue of what should be done in regards to the account debtor

if the purchaser should through inadvertence or otherwise find itself trying to collect an account that had been discharged in Bankruptcy. Although there was no testimony on this matter, the Court articulates its assumption that the Agreement evolved from a form of contract used by Unifund in its business of acquiring accounts receivable and was edited to reflect various specifically negotiated points between Ohio Savings and National.

transferred to Unifund/National once the sale was complete; however, both Ohio Savings and National representatives stated they were not sure if discharge papers would have been retained in the records.

National's president further testified that before National filed complaints to collect on those accounts, it did two things. First, National sent out 30 day demand letters on May 20, 1998 to all of the account debtors at the addresses provided by Ohio Savings[2]. It received approximately 400–500 responses to those letters stating the debt had been the subject of a bankruptcy, but received no such response from the Dillemuths and Laffertys. While National found such a response "alarming", it did not stop the collection process. Nor, apparently, did it do anything to re-address or otherwise maintain any of the 30-day letters that might have been returned because of expired post office forwarding orders or no forwarding orders.

Second, within three to four days following the sending of the demand letters, National ran a credit check on the accounts using a service called Quest which is a product of Experian, an entity formed in 1996 from the merger of CCN Group and TRW Information Systems and Services. This service permitted National to download its database of account debtor names to Experian; Experian then ran a credit check and electronically sent the results to National via computer about 30 days later. National's president contends that this search was done on the Dillemuth and Lafferty accounts in May and that the results did not show any discharge in bankruptcy. He stated that a second search was done through Banco, another credit agency, around September.

In August of 1997, National filed complaints against the Dillemuths and Laffertys. National was thereafter informed that the debtors had received a discharge and the complaints were eventually dismissed by either the municipal courts or National. Bader stated that National did not dismiss those complaints promptly because it had received hundreds of answers to complaints, it did not

have sufficient staff to respond to all of them, and there was a turnover of counsel for National.

### Issue Presented

The issues before this Court are whether any violations of the discharge injunction by the original creditor and/or the subsequent collecting entity occur (1) when the creditor sells a portfolio of debt which includes discharged debt to an entity it knows intends to collect on that debt and/or (2) when that entity files a state court action to collect that debt.

### Legal Authorities

The primary statutory provisions to be interpreted and applied to these facts are:

11 U.S.C. § 727(b):

> "a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter...."

11 U.S.C. § 524(a)(2):

> "a discharge in a case under this title— operates as an injunction against the commencement or continuation of an action the employment of process, or *an act, to collect, recover or offset any such debt* as a personal liability of the debtor, whether or not discharge of such debt is waived." (emp.added)

The § 524(a) post-discharge injunction embodies the "fresh start" concept inherent in the Bankruptcy Code by allowing the debtor to begin anew with a debt-free start and without pressure from creditors to repay discharged debts. *Green v. Welsh,* 956 F.2d 30, 33 (2nd Cir.1992); *In re Latanowich,* 207 B.R. 326, 334 (Bankr.D.Mass.1997). The injunction is broad in scope and was intended to preclude virtually all actions to collect. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 363–64 (1978) ("the injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts.") Post-discharge lawsuits

---

**2.** Originally, the letters were sent to the addresses in the Ohio Savings file. Later, those addresses were updated, possibly through skip-tracing, when National could not achieve service on the complaints or if it received return mail.

are clearly prohibited. *In re Walker*, 180 B.R. 834, 842 (Bankr.W.D.La.1995).

11 U.S.C. § 105(a) provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." When a violation of the discharge injunction has been found, courts may award damages pursuant to the civil contempt power found in § 105 and Bankruptcy Rule 9020. *In re Braun*, 152 B.R. 466, 474 (N.D.Ohio 1993) (J. Dowd) (stating that it is well established that Congress granted the bankruptcy courts civil contempt power to enforce its orders); *In re Summers*, 213 B.R. 825 (Bankr.N.D.Ohio 1996) (citing *Braun*); *In re Hardy*, 97 F.3d 1384, 1389–90 (11th Cir.1996). In such a civil contempt proceeding, damages may consist of actual damages and attorneys fees that the injured party incurred from the violation. Such damages must be based on evidence of actual loss. *In re Braun*, 152 B.R. at 474. Additionally, for a willful violation, punitive damages may be awarded. *In re Borowski*, 216 B.R. 922, 925 (Bankr.E.D.Mich.1998) (see cases cited therein). In this context, "willful" means that the creditor knew or was on notice of the stay or discharge and that the action taken was intended, not that the creditor intended to violate the stay or injunction itself. *In re Hill*, 222 B.R. 119, 123 (Bankr. N.D.Ohio 1998); *In re Leber*, 134 B.R. 911, 917 (Bankr.N.D.Ill.1991); *Hardy v. U.S. (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996). There must be some clear disregard for bankruptcy laws. *In re Borowski*, 216 B.R. at 925. "Willful" behavior also occurs if a party has knowledge or notice of sufficient facts "to cause a reasonably prudent person to make an additional inquiry to determine whether a bankruptcy petition has been filed" and fails to do so. *See In re Roush*, 88 B.R. at 164; *In re Summers*, 213 B.R. at 828.

The courts in *In re Roush* and *In re Walker* address similar situations to the cases before this Court. While those case are distinct in that the collecting entity is acting as an agent of the original creditor and the debt was not actually sold, their legal analyses are sufficiently analogous to the instant cases to provide useful guidance. In *In re Roush*, 88 B.R. 163 (Bankr.S.D.Ohio 1988),

after the debtors' Bank One debt had been discharged, they received a collection letter from a law firm acting on behalf of Bank One. Bank One argued that it did not knowingly attempt to collect a debt, that it instructed the law firm to verify debts as to discharge, and that any violation of the discharge injunction was unintentional. The court held that Bank One's procedures were inadequate to prevent such a violation. It stated that willful does not mean that the creditor "must have ill or malice towards the debtors …, but rather only the intent to refer the debtor's obligations for collection without justification for that action." *Id.* at 164–65. Relying on § 105, the court then stated that damages for a violation could consist of costs associated with enforcing compliance and attorney's fees. *Id.* at 165.

*In re Walker* also concerns a creditor who turned over the discharged debt to an agent for collection with knowledge that the debt had been discharged and without so informing the agent. 180 B.R. 834 (Bankr.W.D.La. 1995). The creditor argued that the collection agency acted independently and thus the creditor did not violate the discharge injunction. The court disagreed stating that the creditor could have informed the collecting agent that the debt was discharged and that it was aware that the agent would file a suit to collect the debt. Moreover, the creditor assigned the debt with the express purpose of collecting money and in fact profited from the actions of the agent. The court found that the creditor flagrantly disregarded the post-discharge injunction and awarded actual and punitive damages and attorney's fees and costs. *Id.* at 849–50.

### Dillemuth and Lafferty Cases

In the instant two cases, the Court finds that both the Dillemuths and Laffertys received a discharge of debt under § 727 and that the continuing injunction under § 524 is in place. Both National and Ohio Savings appear to treat the Agreement as a shield to any liability and point the finger of blame at the other. However, as detailed below, the Court finds that, for individual and separate reasons, Ohio Savings and National each acted to collect, recover or offset debt discharged in bankruptcy. Ohio Savings and

National have therefore violated those discharge injunctions and have deprived the debtors of their opportunity to obtain a fresh start free from further collection efforts.

▮▮▮ Ohio Savings admitted receiving notice of both the filing of bankruptcy and discharge of the Ohio Savings debt for each set of debtors. It bears responsibility with respect to the account debtors for failing to effectively note that discharge in its records. Thereafter, Ohio Savings sold those accounts to National. The selling of accounts is a deliberate act to collect on a discharged debt. See In re Walker, 180 B.R. at 844. While Ohio Savings argues that it cannot be responsible for the actions of National and the filing of the lawsuits against the debtors, Ohio Savings knew that National would take action to collect against the debtors on those accounts and had received notice of the debtors' discharges. Ohio Savings was in the position to prevent such actions through proper identification of those accounts that had been discharged in bankruptcy and chose to handle such notice of discharge in a nonchalant, perhaps even cavalier, manner. Procedures currently in place at Ohio Savings cannot insulate it from liability for damage caused by its historically inadequate memorialization of notices received from bankruptcy courts. See e.g. In re Roush, 88 B.R. at 164. Ohio Savings' points to its notification to National that certain accounts were affected by bankruptcy and claims that it chose Unifund as a purchaser because Unifund claimed to use particular care in weeding out accounts that had been the subject of a bankruptcy discharge. However, the Agreement is silent with respect to any mechanism that would provide prompt curative action vis a vis discharged account debtors if and when Ohio Savings might learn of such accounts slipping through their sorting process. Having contracted to place itself in a powerless position, Ohio Savings cannot use its abdication of power as a defense.

The violations of the discharge injunction by Ohio Savings is a willful violation. By its own admission, Ohio Savings received the discharge of the debtors and thus had actual notice of those discharges. Ohio Savings' failure to properly note that discharge in the debtors' files cannot erase the fact that it had such notice. Ohio Savings intended to sell the discharged accounts to collect on the accounts and knew that those accounts would be collected upon by Unifund/National. To its credit, once it learned of the collection efforts of National via customer complaints and discovered the coding error, Ohio Savings tried to correct its mistakes. It not only notified National to cease collections, but also talked with former customers and sent apology letters. Such actions show that Ohio Savings did not exhibit disregard for the bankruptcy process, but understood belatedly the seriousness of the situation. The wilfulness of its violation is mitigated somewhat by its late-emerging attitude of contrition. Because the award of punitive damages is discretionary and in light of the belated corrective course of action, this Court declines to order payment of punitive damages by Ohio Savings. .

▮▮▮ National also clearly engaged in acts to collect a discharged debt. Upon receiving the accounts receivable from Ohio Savings and before running even the most basic credit check, National sent out 30 day demand letters to account debtors. Keeping its head in the sand, National apparently would welcome return checks from former bankruptcy debtors lacking sophistication or who might have counsel with a lack of interest in following up on cases that had been closed years ago. Within three months of receiving the Account Receivables from Ohio Savings through Unifund, National then filed complaints against the Laffertys and Dillemuths among others to collect on discharged debts, an action clearly prohibited by § 524. See In re Walker, 180 B.R. at 842. Once notified that these debts had been discharged in bankruptcy, National failed to promptly dismiss those complaints. At the evidentiary hearing, National referred to its procedures as its safety net claiming it took every step required by the Fair Debt Collection Practices Act, but in actuality, National threw caution to the wind instead choosing to pursue the quickest recovery. Even after notice from Ohio Savings that the Account Receivables potentially included many discharged debts and the "alarming" response it re-

ceived from the 30-day demand letters, National continued its collection efforts on accounts it had reason to believe were not properly collectible. Moreover, it had the ability to update its account debtor information but again chose to forge ahead with collection. A more prudent collector would have first run a credit check, then sent out its 30-day demand letter and then afforded those results due consideration. At a minimum, from the point that it learned that the portfolio transferred to it pursuant to the Agreement contained numerous accounts that had been discharged in bankruptcy and it did not pause in its collection march nor take immediate action to reverse collection efforts on bankruptcy discharged accounts, National's action violated the discharge injunction.

In addition, the Court finds that National's actions constitute willful violations of the post-discharge injunction. Specifically, National was put on notice in four different time frames that there may be potential discharged debts included in the Account Receivables. By National's own admission, it received an "alarming" response to its 30-day demand letters claiming that the debts had been discharged in bankruptcy. In June of 1997, Ohio Savings bought back ineligible Account Receivables and in September or October, it asked National to cease collection due to a coding error. In July, National contacted Ohio Savings about repurchasing additional accounts that may be ineligible. Such facts are sufficient to show that National had notice that it needed to further inquiry as to the eligibility of each of the transferred accounts for collection. *See In re Summers*, 213 B.R. at 828. Additionally, once National was plainly notified that the Dillemuths' and Laffertys' debts had been discharged in bankruptcy, it failed to dismiss the complaints, either promptly in one case or at all in the other. Such circumstances indicate that National exhibited a clear disregard for bankruptcy law and the discharge granted to debtors. *See In re Borowski*, 216 B.R. at 925. National cannot turn a blind eye to the warning signs, continue to collect a discharged debt and not expect to deal with the

consequences. Accordingly, in addition to the compensatory damages and attorney's fees, discussed below, National is responsible for punitive damages in the amount of $1,000.00 for each the Dillemuths and Laffertys.

*Damages*

The Court finds that the violations by Ohio Savings and National entitle the debtors to actual damages and attorney's fees. Lafferty testified that she incurred attorney's fees for Mr. Hiteman when he represented her on the complaint filed by National. Dillemuth testified to damages in the amount of $600 for lost wages, attorney's fees and $25 in increased housing expense for one month.[3] Mr. Hiteman testified that he has incurred a total of $1,500 in attorney's fees for these cases. Ohio Savings and National are jointly and severally liable for the compensatory damages and debtors' attorney's fees. In addition, as addressed above, the Court awards punitive damages in the amount of $1,000.00 per couple payable to the Laffertys and to the Dillemuths.

Based upon the above discussion, Ohio Savings and National have violated the discharge injunction. Ohio Savings and National are jointly and severally liable to the Dillemuths for actual damages in the amount of $825.00 ($600.00 lost wages, $25.00 increased housing expense, and $200.00 state court action attorney's fees) and to the Laffertys for actual damages in the amounts of $100.00 for attorney's fees with respect to the state court defense, and to Mr. Hiteman for attorney's fees in the amount of $1,200.00 for the representation of both parties in this contempt action. National is liable to the Dillemuths and Lafferty for punitive damages in the amount of $1,000.00 each.

**IT IS SO ORDERED.**

---

3. $425 for rent incurred due to delay in mortgage as a direct result of the complaint, had

mortgage gone through he would have paid $400.