In re Gene E. **WATKINS** and Karen D. Watkins, Debtors.

Gene E. Watkins and Karen D. Watkins, Plaintiffs,

v.

Guardian Loan Company of Massapequa, Inc., Defendant.

Bankruptcy No. 894–86473–478.
Adversary No. 898–8640–478.

United States Bankruptcy Court, E.D. New York.

Aug. 25, 1999.

Flower & Medalie, Bay Shore, NY, by Jeffrey Hertzberg, for plaintiffs.

David J. Weiss, Garden City, NY, for defendant.

## DECISION AND ORDER REGARDING VIOLATION OF DISCHARGE INJUNCTION PURSUANT TO 11 U.S.C. SECTION 524

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is an adversary proceeding brought by Gene E. Watkins and Karen D. Watkins (collectively, the "Debtors" or the "Watkins") against Guardian Loan Company of Massapequa, Inc. ("Guardian" or the "Defendant"), in which the questions presented are (1) whether a post-petition loan made by Guardian to the Debtors violated the discharge provisions of 11 U.S.C. § 524 (the " § 524 Injunction") and the discharge order dated March 29, 1995 (the "Discharge Order") (the § 524 Injunction and the Discharge Order are sometimes referred to collectively herein as the "Discharge Injunction"); (2) whether Guardian violated New York State civil and/or criminal usury laws; and (3) whether Debtors' request for attorney's fees and punitive damages is appropriate. Guardian interposed an answer with a counterclaim for $8,253.21 that it claimed was still due and owing by the Debtors, and moved for partial summary judgment. The Court granted Guardian's

motion for partial summary judgment on the usury issue,[1] and the trial of the remaining issues was held on April 20, 1999.

After hearing the evidence presented, the Court found that Guardian willfully violated the Discharge Injunction. Therefore, the Court orally ordered that (a) the Defendant cancel and nullify the note evidencing the Debtors' indebtedness to the Defendant in the principal amount of $8,253.21, plus interest at 25% per annum; (b) refund to the Debtors any monies paid to Guardian in excess of an indebtedness of $4,000, at an interest rate of 25% per annum; and (c) avoid and cancel the security interest granted to Guardian to secure the repayment of the note. This order will incorporate that prior oral decision.

The issue whether to award attorney's fees and costs and/or punitive damages was briefed and oral argument was held on June 15, 1999, after which the Court indicated it would award to the Debtors attorney's fees and costs in an amount to be determined after the Defendant had an opportunity to review and file opposition to the amount requested for fees by Debtor's counsel. The Court also reserved decision on the issue of whether to award punitive damages for violation of the Discharge Injunction, which is one of first impression in this Circuit.

Having found that Guardian willfully violated section 524 of the Bankruptcy Code, the issue remaining is what is the appropriate sanction to be awarded against the Defendant. This decision constitutes the Court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(c), as made applicable herein by Fed.R.Bankr.P. 7052.

### BACKGROUND

This reopened case was originally filed as a Chapter 7 on November 16, 1994.

---

1. In response to Guardian's motion for partial summary judgment, by Order dated February 19, 1999, the Court dismissed the Debtor's causes of action for civil and criminal usury. The Court specifically found that it lacked jurisdiction over the issue of criminal usury and found that civil usury was inapplicable with respect to the rate of interest charged by Guardian pursuant to the statute under which it operated.

Pre-petition, the Debtors had executed a promissory note in favor of the Defendant in the amount of $9,267.45, with interest at the rate of 25%. The note was secured by a 1991 Chevy Cavalier and a 1985 Subaru Sedan. When the Debtors filed their Chapter 7 petition, they were in default under the loan in the amount of $8,939.55, plus interest at the rate of 25%.

On or about September 4, 1998, the Debtors filed a motion to reopen the case for the express purpose of commencing the instant adversary proceeding against Guardian, claiming that Guardian had violated their discharge injunction. Guardian vigorously opposed the motion to reopen, filed a Memorandum of Law in Opposition and appeared at a hearing to argue against the motion. After hearing the parties' arguments, the Court found that there was sufficient cause to reopen the case and granted the Debtors' motion. The Court directed that the Debtor's file an adversary proceeding within 30 days to determine whether their claims pursuant to § 524(a)(2) of the Bankruptcy Code were in fact accurate, and the Debtors filed this adversary proceeding.

### FACTS

Prior to the bankruptcy filing, the Watkins had borrowed from the Defendant four (4) times, all at 25% interest, sometimes secured and sometimes not. The Defendant is a New York licensed lender pursuant to Article 9 of the New York Banking Law, Section 340, *et seq.* (the "Licensed Lender Law").

As a licensed lender, the Defendant is authorized to make loans of up to $25,000 at interest rates as agreed to by the borrower and the lender. By virtue of Section 340 of the Licensed Lender Law, the Defendant is not subject to the statutory limits on the rates of interest that may be charged pursuant to Section 5–501 of the New York General Obligations Law ("GOL") and Section 190.40 of the New York Penal Law. Section 351 of the Licensed Lender Law specifically provides that only interest on amounts loaned in excess of $25,000 is subject to the maximum rates permitted by G.O.L. § 5–501. However, the Licensed Lender Law does subject licensed lenders to stringent restrictions, such as limiting the type of security they can take and prohibiting them from charging examination fees, service fees, brokerage commissions or any other expenses, fees or bonuses not specifically authorized by the statute.

The purpose of allowing licensed lenders such as Guardian to charge borrowers any rate agreed upon for loans under $25,000 is to make credit available to high risk borrowers who would otherwise have no access to legal credit services. For this reason the New York legislature has, for 100 years, allowed licensed lenders to make small personal loans at interest rates far in excess of those set forth in the civil and criminal usury statutes. Since each of the loans made by Guardian to the Watkins were in the principal amount of less than $25,000, Guardian was permitted by statute to charge an interest rate of 25%.

In each case, when the Debtors obtained a new loan, a portion of the loan amount to be advanced was used to satisfy the prior loan, so that the Debtors actually received less than the amount stated as due.[2] As of the petition date, the Debtors had entered into their fourth loan with Guardian in the stated amount of $9,257.45, with interest at the rate of 25% per annum (the "Pre–Petition Loan"). Pursuant to the relevant

---

**2.** The first loan, in the principal amount of $2,728.90, occurred on May 20, 1988. On April 27, 1990, the Watkins obtained a second loan from Guardian in the principal amount of $3,834.04, $1,196.42 of which was used toward repayment of the previous loan. On March 1, 1991, the Watkins received a third loan from Guardian in the principal amount of $7,884.63, of which $2,868.34 was used toward repayment of the second loan. The Watkins' fourth loan, in the principal amount of $9,267.45, was made on December 28, 1992. Again the Watkins used a portion of the new loan, $5,185.68, toward repayment of the third loan.

provisions of the Licensed Lender Law, Guardian was authorized to lend monies at this interest rate. Repayment of the Pre–Petition Loan was secured by security interests granted by the Debtors to Guardian with respect to a 1991 Chevrolet and a 1985 Subaru (collectively, the "Collateral"). The Pre–Petition Loan was listed in the Debtors' bankruptcy petition. Guardian received notice of the bankruptcy filing, as evidenced by the Court's Certificate of Service dated November 24, 1994. As of the Filing Date, Debtors owed Guardian $8,939.55 in connection with the Pre–Petition Loan. The Debtors never reaffirmed said debt to Guardian pursuant to the requirements of 11 U.S.C. § 524(c).

During the course of the Chapter 7 case, Guardian obtained relief from the automatic stay for the purpose of recovery and sale of the Collateral. The sale of the vehicles under State law took place in or about July, 1996. There remained an unsecured deficiency balance due and owing from the Debtors to Guardian in the amount of $5,780.12. By virtue of the Discharge Order issued on March 29, 1995, the deficiency balance was discharged. The discharge specifically stated that all discharged creditors were enjoined from instituting or continuing any action or employing any process to collect debts of the Debtors. Guardian was clearly such a discharged creditor, having been listed in the Debtors' schedules, having received notice of the bankruptcy filing and having subjected itself to the jurisdiction of this Court by moving to vacate the automatic stay. Moreover, Guardian admitted that it was aware of the Debtors' discharge. Shortly after the issuance of the Discharge Order, the case was closed.

In or about August 1995, Alex Mazza, a Vice President and loan manager at Guardian for over twenty-one years, contacted the Debtors by telephone, advising them that in spite of their bankruptcy discharge the Debtors still had good credit with Guardian and should consider Guardian for any future borrowing needs.

Remembering Mazza's words, on or about October 2, 1996, Gene Watkins contacted Mazza, requesting a personal loan in the amount of $3,000. Mazza, a senior credit manager, typically had discretion to make such small loans, but said that he would have to get back to Watkins about this loan. Mazza told the Debtors that Guardian would not lend since the prior debt to them had been discharged, but if the Debtors would pay back part of that loan, he might be able to lend them $3,000 if they agreed to pay $6,000 back at 25% interest. Due to the unique circumstances of this loan request, Mazza spoke with Clifford Schultz, the president and sole shareholder of Guardian. Although Schultz testified that he had never before or since lent money to a customer in the Watkins' circumstances, Schultz did permit Mazza to lend money to the Watkins contingent, however, upon them paying part of the discharged amount in addition to the new funds being advanced. This had been the practice between Guardian and the Debtors prior to the filing of the petition, and Guardian was continuing as if there had been no bankruptcy. That same day, Mazza telephoned the Debtors and advised them that Guardian would lend them the $3,000 they requested if they agreed to pay an additional $3,000 of the monies still due to Guardian, so that there would be a note for $6,000, payable at 25% interest. Gene Watkins indicated that he would get back to Mazza with a decision after he spoke to his wife. The Debtors attempted to borrow funds from another source but could not do so. On October 11, 1996, Gene Watkins called Mazza to indicate that he and his wife were willing to accept the loan in spite of the unfavorable terms, but that they required an additional $1,000, or a loan in the amount of $4,000. Mazza advised him that Guardian would be willing to advance the additional sum, but that the loan documents would reflect a debt of $8,000, at 25% interest; i.e., a $4,000 advance and a repayment of $4,000 of the amount previously discharged.

When faced with the choice of accepting a loan based upon a repayment of $4,000 of the discharged debt or not obtaining a loan, the Debtors consented to the loan in the amount of $8,000. There was no request for Debtors to provide any financial statement in order to evaluate whether Guardian should make a loan to the Debtors.

During their conversations, Gene Watkins indicated to Mazza that he needed the money for legal expenses in connection with an automobile accident in which his son was injured. At trial, the Debtors testified that they actually needed the money to make mortgage payments on their home. Mazza testified that, had he known that the money was to be used for mortgage payments, he would not have approved the loan, since that was a sign of financial hardship that would have disqualified the Debtors from receiving a personal loan from Guardian. There was no evidence to support this statement, and since no financial information was requested of the Debtors, the Court refuses to accept this statement as fact.

On October 16, 1996, Guardian approved the Debtors' application for a loan totaling $8,253.31, with interest at 25% per annum. This loan required the Debtors to pay $273.66 a month for 48 months, which amounts to a repayment of $13,135.68 for a $4,000 advance. The Watkins secured this loan by granting Guardian a security interest in their post bankruptcy acquired 1992 Subaru Legacy, and Guardian recorded a lien on the vehicle with the Department of Motor Vehicles. The proceeds of the loan were distributed as follows:

| | |
|---|---|
| $4,000.00 | Given directly to the Debtors |
| 5.00 | To public officials for filing fees |
| 248.31 | Paid towards insurance for the loan |
| 4,000.00 | Check payable to Guardian and Gene Watkins |

The $4,000 check payable to Guardian and Gene Watkins was immediately endorsed by Gene Watkins and deposited into Guardian's bank account.

Mazza and Schultz testified that together they had more than 40 years of experience in the lending business and, although they are not lawyers, they understand the bankruptcy concepts of the automatic stay and the discharge in bankruptcy. Guardian did not seek or obtain any reaffirmation agreement before the subject loan was made.

When the Debtors fell behind on payments to Guardian, Guardian began to take action to collect the debt by sending the Debtors late notices and requesting that the Debtors contact Guardian to make the past due payments. Guardian's personnel made numerous phone calls to the Debtors and sent numerous letters. A letter dated August 25, 1998 informed the Debtors that their debt was extremely overdue and that Guardian intended to take legal action if the entire balance was not paid within 10 days. It was at this point that the Debtors moved to reopen their Chapter 7 case. By late October 1998, when the motion to reopen was granted, the Debtors had overpaid the amount due on their $4,000 loan by approximately $500.[3]

On October 28, 1998, prior to the commencement of the adversary proceeding, Guardian offered to settle all claims of the Debtors by (a) recalculating the post-discharge loan, deleting the $4,000 of principal credited to the pre-petition deficiency, (b) refunding to the Debtors all overpayments made in connection with the post-discharge loan, (c) releasing the liens on the Debtors' car, and (d) paying the Debtors $1,000 cash. The Debtors made a counteroffer of settlement, which was rejected, and the adversary complaint was filed. On December 15, 1998, Guardian made an offer of judgment to the Watkins

---

**3.** The Debtors paid a total of $5,354.10 against the Post–Petition Loan. According to Schultz' testimony, the total amount needed to retire a loan in the principal amount of $4,000.00, with monthly payments of $273.66, is $5,095.00. Schultz calculated that the total amount of actual damages was $597.33, after crediting late charges of $246.22 to the Debtors. Deft's Post–Trial Brief, p. 8.

of $1,500, which Guardian calculated to be three times Debtors' out-of-pocket damages. The Debtors did not accept the offer, as it did not include attorney's fees incurred up to that date.

At trial, the Court found that Guardian willfully and knowingly violated the Discharge Injunction and that, by taking advantage of the Debtors' desperate need for money, induced them to agree to repay a discharged debt. The Defendant clearly evinced bad faith by seizing the opportunity to recover some of the discharged debt, while Guardian knew of the Discharge Injunction and it was apparent that repayment would pose a hardship to the Debtors. The issue of whether falsifying the reason the Debtors gave for requesting the loan would have made a difference to the Defendant was not supported by evidence to indicate it was a material issue. In fact, based on all facts, this Court finds that the Defendant was interested in making the loan to the Debtors in order to obtain a partial payment of the debt previously discharged regardless of the reasons given by the Debtors for the loan.

Debtors' counsel now seeks compensation in the amount of $23,200.00 in legal fees, representing 92.8 hours in time expended and $260.93 in expense reimbursements, for a total of $23,460.93. The Court is mindful that the Debtors have not advanced any moneys to their counsel, and counsel has represented to the Court that his firm will not charge the Debtors for the services performed on their behalf, in view of their financial position.

Guardian opposes any award of attorney's fees in excess of $4,000, as being unreasonable based on the work performed, which Guardian claims was unnecessary and excessive. However, Guardian's actions in vigorously opposing the motion to reopen the Chapter 7 case, denying any wrongdoing and refusing to compensate Debtors' counsel for work already performed when it made its settlement offer, demonstrates that this litigation was driven by the unyielding legal positions taken by Guardian. In view of the foregoing, it was incumbent upon counsel to the Debtor to perform the work he did in connection with the motion to reopen the case and to litigate the adversary proceeding to trial and post-trial hearings. Guardian also seeks reimbursement for costs of $574.00 incurred after the December 15, 1998 offer of judgment.

The Court finds that Debtor's counsel is entitled to reasonable compensation for its legal services as an actual cost of bringing this action. However, counsel may have been overzealous in his desire to recover on the claims of usury based on a 25% interest rate. He spent extensive time researching this issue and trying to defend Defendant's summary judgment motion, ultimately spending at least 24.2 hours as to the usury issue alone. The Court believes that only a fraction of the time so spent is compensable.

### DISCUSSION

### Willful Violation of the Discharge Injunction

■■■ The Discharge Injunction provided for in Section 524(a)(2) of the Bankruptcy Code states as follows:

> (a) A discharge in a case under this title
>
>    *     *     *     *     *     *
>
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

11 U.S.C. § 524(a)(2). The purpose of the permanent injunction is to effectuate one of the primary purposes of the Bankruptcy Code: to afford the debtor a financial fresh start and to insure that, once a debt is discharged, the debtor will not be pressured in any way to repay it. *In re Borowski,* 216 B.R. 922, 924 (Bankr. E.D.Mich.1998). Nevertheless, Congress has fashioned a method for debtors to

voluntarily reaffirm a debt that would otherwise be discharged in bankruptcy by enacting Section 524(a)(c), which specifically sets forth the procedures to be followed to effect a voluntary reaffirmation of a debt by a debtor. The section applicable to the case provides in pertinent part as follows:

> (c) An agreement between a holder of a claim and the debtor, the consideration for which, *in whole or in part,* is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived *only if* —
>
> (1) such agreement was made *before* the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
>
> (2)(A) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim; and
>
> (B) such agreement contains a clear and conspicuous statement which advises the debtor that such agreement is not required under this title, under nonbankruptcy law, or under any agreement not in accordance with the provisions of this subsection;

11 U.S.C. § 524(c) (emphasis supplied). Reaffirmation agreements between a debtor and a creditor are strictly construed and the letter of the law must be closely followed in order for a reaffirmation agreement to be effective. *In re Churchill,* 89 B.R. 878 (Bankr.D.Colo.1988). Guardian admittedly did not comply with the provisions of Section 524(c) concerning a reaffirmation agreement before it required the Debtors to repay $4,000 of a debt that was already discharged. A reaffirmation agreement was never drafted or executed, endorsed by the Debtors' bankruptcy counsel and/or approved by this Court.

Guardian has continuously insisted that compliance with the provisions of Section 524(c) was not mandated in this matter, citing several cases in support of its argument. While bankruptcy courts are split on this issue,[4] the Court believes that the cases cited by Guardian are distinguishable from this case based on their facts, as discussed below.

In *In re Heirholzer,* 170 B.R. 938 (Bankr.N.D.Ohio 1994), the court held that the post-discharge promissory note executed by the debtor constituted a new contract that was supported by good and sufficient consideration (creditor agreed to forbear from foreclosing on the mortgage on debtor's real property, which passed through the bankruptcy) and was completely separate from the initial note that was discharged in bankruptcy, and, thus, the post-discharge note was enforceable by the creditor. In fact, the *Heirholzer* court specifically stated that "the pivotal factor which serves to establish a valid post discharge contract is the existence of some separate consideration for the subsequent agreement from the creditor." *Id.,* at 940. Since the creditor's promise not to foreclose was determined to be sufficient consideration to form a completely new contract between the parties, which was evidenced by the execution of completely new loan documents, the *Heirholzer* court found that the debtor was not being called upon to reaffirm the discharged debt. Guardian appears to argue that this too is a completely new contract and that the advance of $4,000 in additional funds serves as consideration for the Watkins' agreement to repay $8,000 plus interest. However, this Court finds that the $4,000

---

**4.** *Compare Matter of Vazquez,* 221 B.R. 222 (Bankr.N.D.Ill.1998); *Matter of Arnold,* 206 B.R. 560 (Bankr.N.D.Ala.1997); *In re Watson,* 192 B.R. 739 (9th Cir. BAP 1996); *In re Getzoff,* 180 B.R. 572 (9th Cir. BAP 1995) with *In re Heirholzer,* 170 B.R. 938 (Bankr. N.D.Ohio 1994); *In re Petersen,* 110 B.R. 946 (Bankr.D.Colo.1990); *In re Button,* 18 B.R. 171 (Bankr.W.D.N.Y.1982).

advance is not sufficient consideration to form a completely new post-discharge contract that obviates the need to comply with the provisions of Section 524(c). Furthermore, whereas the creditor in *Heirholzer* agreed to forbear from foreclosing on its collateral although it had a right to do so, Guardian obtained relief from the stay to foreclose on the Collateral securing the Pre–Petition Loan; therefore there was no forbearance by Guardian as to any right of action against the Debtors or their property.

Similarly, in *In re Petersen,* 110 B.R. 946 (Bankr.D.Colo.1990), a debtor who listed a commercial lease in his petition, which lease was rejected, signed a post-discharge addendum that reinstated the lease. At the time the addendum was executed, Petersen was current in his rent payments. Petersen occupied the premises for almost three years while continuing to pay rent. After three years, the debtor notified the landlord that he would no longer be able to make payments on the lease. When the landlord filed suit to recover the rent payments, Petersen claimed that the lease was discharged in the prior bankruptcy case. The court found for the landlord, stating that where a debtor elects, post-petition, to adopt and continue a pre-petition lease agreement rejected by the trustee, and there is legally sufficient post-petition consideration between the parties, then the lease will be deemed a binding, enforceable and post-petition obligation. *Id.,* at 950. The court based its decision, in part, on the fact that the debtor evidently acted with the assistance of counsel, the lease was not in default at the time it was reinstated, and there was new and substantial post-petition consideration and benefits flowing from the landlord to the debtor. In the instant case, there is a discharged debt, which can only be reaffirmed upon strict compliance with Section 524(c), the consideration offered by Guardian was not sufficient to form a new contract, and the Debtors did not have the assistance of counsel when agreeing to the onerous terms of the post-discharge loan.

In *In re Button,* 18 B.R. 171 (Bankr. W.D.N.Y.1982), the debtor was found guilty of petit larceny, placed on probation and required to make restitution to the victim. When the debtor filed for bankruptcy, he stopped making restitution payments. All of the debtor's debts were discharged except for the restitution payments. The *Button* court found that, although the debtor's debt to the victim was discharged, the criminal sentence of restitution was a different matter, in that it was "part of the punishment for the crime to which the debtor pleaded guilty ... in a matter entirely within the jurisdiction of the courts of New York State." *Id.,* at 172. When the debtor was threatened with jail for violating the terms of his parole, he executed a promissory note with the victim. The victim was deemed to have received satisfactory restitution and the debtor was released from parole. The debtor later defaulted on the note and came back to the bankruptcy court, claiming that he was not obligated to pay it since the debt had been discharged in the prior bankruptcy and no reaffirmation agreement was filed pursuant to Section 524(c). The court held that the note evidenced an entirely new post-petition debt supported by good and sufficient consideration (the debtor's freedom), by which the debtor substituted a civil enforcement mechanism for the criminal process. *Button* is clearly distinguishable from the instant case, in that by entering into a whole new agreement with the victim to repay the debt it enabled the dishonest debtor to stay out of jail. Here, although the Debtors misstated the purpose of the loan, there is no question that Guardian saw this as a means of recouping some of their discharged debt.

▪ In short, the Court does not accept Guardian's argument that *Heirholzer, Petersen* and *Button* support its theory that a reaffirmation agreement was unnecessary under these circumstances. In this case, there was no actual consideration provided

to the Debtors to support a finding of a new post-petition contract. In fact, the Court holds that a reaffirmation agreement is definitely appropriate when debtors agree to repay a portion of their previously discharged debt unless the creditor can clearly establish that some exception excuses it from the § 524 Injunction.

■ An exception to the requirement of a reaffirmation agreement is set forth in Section 524(f) of the Bankruptcy Code, which provides:

> (f) Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt.

11 U.S.C. § 524(f). Guardian argues it should be excused from the requirement of entering into a reaffirmation agreement because the Debtors voluntarily decided to repay $4,000 of the discharged debt. However, as previously stated, these Debtors did not volunteer to repay the discharged debt, but, rather, chose to accept the "take-it-or-leave-it" terms proposed by Guardian. When faced with the choice of accepting a loan based upon a repayment of a portion of the discharged debt ($4,000), or not obtaining a loan for the $4,000 actually requested, the Debtors consented to the loan in the amount of $8,000. They did not willfully or voluntarily offer to pay this pre-petition $4,000 debt. They were not financially capable of making such a voluntary payment. In fact, it was a hardship since it required repayment over time at 25% interest of a sum they did not receive. They had no moral duty to repay this debt, nor did they have any legal obligation to do so. By no stretch of the imagination could this be interpreted as a voluntary offer to repay the discharged debt.

The drafters of Section 524(c) wrote a clear and unambiguous statute which requires strict compliance by discharged creditors. This Court will not countenance a creditor, in this case a licensed lender, that knowingly and willfully refuses to adhere to this basic precept of bankruptcy law.

## SANCTIONS

### Attorney's Fees

■ Generally, the "American Rule" governs the awarding of attorney's fees in federal courts. *In re Walker*, 180 B.R. 834, 849 (Bankr.W.D.La.1995); *In re Brantley*, 116 B.R. 443 (Bankr.D.Md.1990). The "American Rule" provides that each party should bear the cost of its litigation. *Walker*, at 849. Thus, in the United States, the prevailing litigant is ordinarily not entitled to collect the reasonable attorney's fees from the loser. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

■ An exception to the general rule applies when a statute specifically provides for the award of attorney's fees. There is no express statutory provision for payment of attorney's fees for violation of the § 524 Injunction. *Brantley*, 116 B.R. at 449. However, judicially created exceptions to the "American Rule" apply (1) when a defendant willfully disobeys a court order and (2) when a losing party acts in bad faith, vexatiously, wantonly, or for oppressive reasons. *Walker*, at 849; *Brantley*, at 449. In this case, the Court has specifically found that Guardian willfully disobeyed the Discharge Order and acted in bad faith in inducing the Debtors to enter into the post-discharge loan.

The evidence establishes that the Defendant, whose personnel knew that the Debtors' obligation to repay the Pre–Petition Loan had been discharged, induced the Debtors to execute a note for over $8,000, bearing interest at 25% per annum for a term of 48 months, the repayment of which was secured by the Debtors' automobile, in consideration for a $4,000 loan. Notwithstanding that such a loan was impermissible as violative of the Discharge Injunction, Guardian sent numerous late payment notices to the Debtors, made several telephone calls demanding payment, and even threatened legal action against

the Debtors. In view of the fact that the Watkins had no choice but to retain counsel to represent their interests when Guardian threatened suit, this Court finds that their reasonable attorney's fees and expenses are appropriate to be included as actual damages for willful violation of the Discharge Injunction, to the extent approved by this Court.

The Court notes that the situation at bar is analogous to a creditor's willful violation of the automatic stay. If a creditor charged with violating the automatic stay knows that the stay is in effect, any deliberate act taken in violation of the stay justifies an award of actual damages, including attorney's fees, and, in appropriate circumstances, punitive damages. 11 U.S.C. § 362(h); *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc. (In re Crysen/Montenay Co.)*, 902 F.2d 1098 (2d Cir. 1990); *In re Robinson*, 228 B.R. 75 (Bankr.E.D.N.Y.1998).

In determining the appropriate amount of attorney's fees to award for willful violations of the automatic stay, courts will consider the following factors: (a) time and labor required; (b) novelty and difficulty of the questions raised; (c) the skill required to properly perform the legal services rendered; (d) the preclusion of other employment by the attorney due to the acceptance of the case; (e) the customary fee charged for like work; (f) whether the fee sought is fixed or contingent; (g) the time limitations imposed by the clients or the circumstances; (h) the amount in controversy and the results obtained; (i) the experience, reputation and ability of the attorney; (j) the 'undesirability' of the case; (k) the nature and length of the professional relationship between the attorney and the client; and (*l*) attorney fee awards in similar cases. *See, e.g., In re Sucre*, 226 B.R. 340, 351–52 (Bankr. S.D.N.Y.1998) (a debtor is entitled to an award of reasonable attorney's fees as part of actual damages for a creditor's willful violation of the automatic stay, with reasonableness to be determined in the same

manner as fees sought pursuant to 11 U.S.C. § 330). In determining the amount of hours reasonably expended, the Court must exclude hours that are excessive, redundant, or otherwise unnecessary. *Id.*, at 352.

The Court believes that the same conclusion is appropriate in a case that violates Section 524 of the Bankruptcy Code as is appropriate in a case where the automatic stay has been violated and applies the same standards as set forth in *In re Sucre*.

The Court has reviewed the Application for Allowance of Attorneys' Fees and Reimbursement of Expenses submitted by Debtor's counsel, Flower & Medalie, Esqs., and finds that the services reasonably required to effectively represent the Watkins entailed the reasonable: (1) time spent in connection with the motion to reopen the case; (2) time spent in connection with preparing the adversary complaint, including the 1.7 hours spent in researching the New York State Banking Law as it pertains to usury; (3) only a fraction of the 24.2 hours spent on the issues of criminal and civil usury subsequent to receipt of Defendant's answer to the complaint; and (4) substantially all time spent in connection with pre-trial discovery, the actual litigation of the case, and various memoranda of law. Accordingly, the Court finds that 60 hours of the time spent by Debtors' counsel is compensable under the "lodestar" method ordinarily used in determining the reasonableness of fees sought pursuant to Section 330 of the Bankruptcy Code.

The Court notes that all of the time spent on Debtors' case was spent by one attorney whose customary hourly rate is $250.00. A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. *Sucre*, at 352. The attorney who represented the Debtors' interests is well known to this Court, having

practiced in the bankruptcy courts of this district since approximately 1985 and is undoubtedly skilled in this type of practice. Few attorneys would have undertaken the representation of the Watkins given that they had no funds to pay for said services. Counsel has expressed to the Court on many occasions that his conscience was shocked by the behavior of the Defendant, and his tenacity in pursuing his clients' rights has borne this out. In so acting, he has vindicated the rights of all discharged debtors who are taken advantage of by a discharged creditor. Counsel's hourly rate is commensurate with the prevailing rate charged in this district by attorneys with similar skill and experience. Therefore, the Court will compensate Debtors' counsel at the requested rate of $250.00 per hour.

The Court has considered other relevant *Sucre* factors, especially the undesirability of taking on a case that is difficult and time-consuming to litigate, where the attorney had little expectation of payment, and the adverse party had much greater resources with which to litigate the action. One of the issues presented here, whether punitive damages are justified in these circumstances, is one of first impression in this Circuit. Without the active participation of counsel to bring this matter before this Court, this issue would not have been adjudicated.

The Court has also reviewed counsel's request for reimbursement of expenses in the amount of $260.93 and finds that they are reasonable out-of-pocket expenses, which are also compensable.

Guardian argues that attorney's fees should be capped at $4,000, since that is the total amount in controversy here. As stated above, Guardian misses the point. The total amount of money at issue here is $13,135.68, which is the total amount that Debtors were required to pay to Guardian for a $4,000 loan. Absent counsel's undertaking this case, the Debtors would still be struggling to pay the $7,800, plus 25% interest remaining unpaid on this illegal

loan. Moreover, in the context of willful violations of the automatic stay, some courts have determined that an aggrieved debtor is entitled to attorney's fees even if no other compensable harm is suffered. *See, e.g. In re Robinson,* 228 B.R. 75, 85 (Bankr.E.D.N.Y.1998); *In re Sumpter,* 171 B.R. 835, 845 (Bankr.N.D.Ill.1994); *Bank of Boston v. Baker (In re Baker),* 140 B.R. 88, 90 (D.Vt.1992).

For all of the foregoing reasons, the Court will allow attorney's fees in the reduced amount of $15,000 and expenses in the full amount requested.

### Punitive Damages

One of the issues presented here, whether punitive damages are justified in these circumstances, is one of first impression in this Circuit. Therefore, its determination here will have repercussions for all debtors and creditors, as well as the bankruptcy bar.

Section 524 of the Bankruptcy Code does not currently have a subsection similar to Section 362(h), which specifically authorizes actual damages, including attorney's fees, and, when appropriate, punitive damages. That is to say, Section 524 of the Bankruptcy Code does not specify any relief for violation of the § 524 Discharge Injunction. However, several bankruptcy courts have held that aggrieved debtors can receive actual damages, attorney's fees and, when appropriate, punitive damages. *See, e.g. In re Vazquez,* 221 B.R. 222 (Bankr.N.D.Ill.1998); *Matter of Arnold,* 206 B.R. 560 (Bankr.N.D.Ala.1997); *In re Walker,* 180 B.R. 834 (Bankr.W.D.La. 1995).

*In re Vazquez* held, "[t]he courts that have awarded punitive sanctions for violations of the discharge injunction require actions taken with either malevolent intent or a clear disregard and disrespect of the bankruptcy laws and that it is not sufficient to merely show the actions were deliberate." *Id.,* at 231. Although the Second Circuit has not spoken to the issue of whether punitive damages should be

awarded in connection with violations of the § 524 Injunction, it applies a stringent rule in determining whether punitive damages should be awarded in the context of willful violations of the automatic stay. In *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc.*, 902 F.2d 1098 (2d Cir.1990), the Second Circuit held that "any deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages. An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)." *Id.*, at 1105.

This Court finds particularly persuasive the discussion of punitive damages in *In re Arnold*, 206 B.R. 560 (Bankr.N.D.Ala. 1997), a case factually similar to the case at bar. In *Arnold*, the debtor filed for bankruptcy and was granted a discharge in 1989. His wife chose not to file bankruptcy with him and fell behind on a $3,000 debt. After failed attempts to work out a repayment schedule, the creditor, a credit union, informed Mrs. Arnold that her wages would be garnished. Garnishment of Mrs. Arnold's wages would ruin her chances of obtaining a grant to complete nursing school. In a last effort to prevent this unfortunate garnishment, Mr. Arnold sought to have his wages garnished instead. Mr. Arnold was informed that to have his wages garnished he would have to rejoin the credit union and repay his discharged debt. The Arnolds, faced with no other options, assented to the conditions.

The *Arnold* court found that the credit union pressured Mr. Arnold to repay his discharged debt as a condition to renegotiate and repay his wife's debt. In addition, the court found that the credit union knowingly used the debtor's arduous circumstances to earn a large profit by recovering money previously discharged in bankruptcy. As a result, the court awarded punitive damages, holding that the credit union "[a]cted willfully in clear disregard and disrespect of the bankruptcy laws with malicious intent." *Id.*, at 568.

The similarity between the *Arnold* case and the Watkins' case is evident. In this case, as in the *Arnold* case, the Debtors were faced with no other option but to assent to unfavorable contract terms presented by the creditor, who was eager to lend them money on its own terms and conditions. The creditors in both cases used the debtors' distressed circumstances to wrongfully collect debts that had previously been discharged. While Guardian claims that it did not act maliciously and that its officers had a good faith belief that the loan was permissible, this Court finds otherwise. In fact, some courts hold that creditors that are informed of a debtor's discharged status cannot claim ignorance. *See, e.g., Bank of Boston v. Baker (In re Baker)*, 140 B.R. 88, 91 (D.Vt.1992) ("the only explanation for the bank's violation of the automatic stay can be malice or bad faith"). It is clear to this Court that Guardian knew of the bankruptcy discharge, encouraged the Debtors to borrow from it and intended to obtain the repayment of a portion of its discharged debt as a condition to granting any loan to the Debtors. This egregious behavior on the part of a licensed lending institution with a general familiarity with bankruptcy laws shocks the Court's conscience. To deter such conduct by this creditor in the future, as well as other discharged creditors, the Court, in its discretion, will award punitive damages of $1,792.00, which represents treble the amount of Debtor's actual damages of $597.33 on the loan. Although this does not appear to be a huge punitive award, the Court's intent is to make a clear statement that punitive damages are appropriate in the event similar circumstances arise in the future. In such an event, the amount of the punitive award would be significantly larger.

In making its determination as to punitive damages, the Court notes that the National Bankruptcy Review Commission's (the "Commission") consumer bankruptcy

recommendations[5] state that Section 524 should be amended to include a subsection to provide that the court shall grant a judgment in favor of an individual who has received a discharge for costs and attorney's fee, plus treble damages, from a creditor who threatens, files suit, or otherwise seeks to collect any debt that was discharged in bankruptcy and was not the subject of an agreement in accordance with subsections (c) and (d) of section 524. The Commission goes on to state that nothing in the said recommendation prevents a debtor from making voluntary repayment of a discharged debt, which is consistent with Section 524(f). However, the Commission's recommendation creates a much needed statutory remedy for noncompliance with the discharge injunction and accords debtors a private right of action for a Section 524(c)(2) violation. *See* "As We Fleece Our Debtors," 102 Dick. L.Rev. 747 (Summer 1998). As of this date, the Commission's recommendations have not yet been enacted; however, it is likely that Congress will eventually pass bankruptcy legislation that will speak to the issue of punitive damages now before the Court. In the meantime, it is incumbent upon this Court to fashion a remedy which it believes will deter institutional lenders from preying upon unsophisticated debtors.

The Court believes that sanctions consisting of a cancellation of the note evidencing the Debtors' debt to the Defendant, a refund to the Debtors of $597.33 (the amount paid to Defendant in excess of the loan of $4,000), the cancellation of Defendant's security interest, payment of $15,260.93 for attorney's fees and costs and the payment of $1,792.00 as punitive damages is an appropriate sanction in this case, and should deter any future violations of Section 524 of the Bankruptcy Code.

5.  The Consumer Recommendations appear in Chapter One of the Commission's Final Report issued on October 20, 1997. *See*

### Defendant's Application for Costs

■ The Defendant also argues, as a matter of law, that Defendant is entitled to costs incurred after it made its $1,500 offer of judgment, since the award of actual damages is $597.33, less than the offer of judgment. The offer of judgment states in pertinent part as follows:

> Guardian will recalculate the amortization of the Watkins post-petition loan, deleting $4,000.00 of the principal amount representing payment of the pre-petition deficiency. Recalculation of the amortization of the post-petition loan will result in overpayment by the Watkins for overpayments in the amount of $565.00. Guardian will pay the Watkins twice the overpayment, or $1,130.00. Guardian will pay the Watkins an additional $370.00 making a total cash payment to Plaintiffs of $1,500.00. The foregoing sum of $1,500.00 includes all costs incurred by Plaintiff to the date of this offer.

Deft's Post–Trial Brief, Exh. A. At the time the Defendant made the offer of judgment, the Watkins had incurred attorney's fees of approximately $8,375.00. However, no provision was made in the offer of judgment for the Debtors' attorney's fees, although the $1,500 offer purports to include all costs incurred by the Watkins to the date of the offer. Not surprisingly, the Watkins rejected the offer of judgment.

Rule 68 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rule 7068, provides in pertinent part as follows:

> An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding for costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

Bankr.Review Comm'n 1997 Final Report, Consumer Bankruptcy 77–302 (1997).

Fed.R.Civ.P. 68; Fed.R.Bankr.P. 7068. The gist of Defendant's argument is that the actual damages actually awarded were $597.33, whereas the offer of judgment was for $1,500; and, therefore, Rule 68 mandates an award to the Defendant of the costs incurred after the offer of judgment, or $579.00. Defendant's argument fails because this Court has awarded judgment in favor of the Debtors and against the Defendant in the amount of $17,650.26, encompassing the $597.33 overpayment by the Debtors, attorney's fees and costs of $15,260.93, and $1,792,00 in punitive damages. Accordingly, the Defendant is not entitled to recover the costs incurred subsequent to the offer of judgment.

### CONCLUSION

1. Jurisdiction in this case is conferred upon this Court pursuant to 28 U.S.C. § 157, 11 U.S.C. §§ 105 and 524, 28 U.S.C § 1334 and the Order of Referral of Matters to the Bankruptcy Judges of this District issued by the United States District Court for the Eastern District of New York on August 28, 1986.

2. This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (O) and 28 U.S.C. § 1334.

3. The Post–Petition Loan which includes an obligation of the Debtors to repay a portion of a discharged debt is a willful violation of the Discharge Injunction provided for in 11 U.S.C. § 524(c)(2). The Defendant and its officers acted in bad faith and in flagrant disregard of the Bankruptcy Code in persuading the Debtors to sign the note for a sum greater than the amount actually advanced to the Debtors. Said note and the security interest granted by the Debtors to the Defendant in connection therewith are set aside as void and invalid.

4. The Debtors are awarded actual damages of $597.33, attorney's fees and costs of $15,260.93, and punitive damages of $1,792, for a total sum of $17,650.26.

For the reasons stated in this decision, it is hereby

ORDERED, that Guardian cancel the note and security agreement given to them by the Debtors; and it is further

ORDERED, that Guardian pay to the Debtors $597.33 as and for actual damages, and $1,792.00 as and for punitive damages; and it is further

ORDERED, that Guardian pay to counsel for the Debtors the sum of $15,260.93 as and for their legal fees; and it is further

ORDERED, that Defendant's motion and counterclaim are hereby denied in all respects.